**AMERICA'S FAVORITE CHICKEN COMPANY f/k/a Al Copeland Enterprises, Inc., Appellant,**

v.

**George SAMARAS, Appellee.**

**No. 04–95–00501–CV.**

Court of Appeals of Texas, San Antonio.

Sept. 4, 1996.

Rehearing Overruled Oct. 7, 1996.

Mitchell L. Weidenbach, Charles Estee, Shannon, Weidenbach & Estee, Inc., San Antonio, Jeffrey S. Levinger, Bradley J. Johnson, Carrington, Coleman, Sloman & Blumenthal, L.L.P., Dallas, for appellant.

Bernard Wm. Fischman, Franklin D. Houser, Tinsman & Houser, Inc., Sharon E. Callaway, Wallace B. Jefferson, Crofts, Callaway & Jefferson, P.C., San Antonio, for appellee.

Before RICKHOFF, GREEN and DUNCAN, JJ.

RICKHOFF, Justice.

Appellant, America's Favorite Chicken Co., formerly known as Al Copeland Enterprises, Inc. ("AFC"), appeals from a judgment rendered in favor of appellee, George Samaras ("Samaras"), in a breach of contract action. The jury found AFC failed to comply with the terms of a letter agreement between AFC and Samaras and awarded Samaras $1,522,586.00 in actual damages, $685,163.60 in attorney's fees, and post-judgment interest on such sums at the rate of ten percent. In nine points of error, AFC contends: (1) the evidence was legally and factually insufficient to support the trial court's conclusion that the contractual provision sought to be enforced was sufficiently definite to be enforceable; (2) the trial court erroneously excluded certain questions from the jury charge and also included an erroneous instruction therein; (3) the evidence was legally and factually insufficient to support the jury's actual damage award; and (4) federal bankruptcy law precludes the recovery of attorney's fees and post-judgment interest. We affirm the trial court's judgment.

## FACTS

The dispute between AFC and Samaras centers on the language contained in paragraph C of a letter agreement entered into between the parties on June 15, 1988 regarding Samaras' employment as Vice–President of Operations for A. Copeland Enterprises, Inc.[1] Paragraph C related to an additional form of compensation to be provided Samaras and reads as follows:

C. BUILD–TO–SUIT RESTAURANTS
The company will provide you with two build-to-suit restaurants (land and build-

---

1. Al Copeland Enterprises, Inc. was reorganized through a Chapter 11 bankruptcy and became known as America's Favorite Chicken Company.

ing); one after 12 months and one after 18 months with all franchise fees waived.

It is undisputed that Samaras accepted employment and performed his services until asked to resign from the company in January of 1990, and he received all other compensation.

After Samaras had been employed by the company for almost one year, Samaras testified that he approached Jim Flynn, the president of the company at that time, to inquire about his build-to-suit rights. Samaras testified that both Flynn and Bill Copeland, the chief operating officer, told him that the company was not in a financial position to proceed with a build-to-suit restaurant at that time.[2] The testimony of Lewis "Bucky" Kilbourne, the chief financial officer, confirmed Samaras' testimony with regard to the company's financial position. Kilbourne stated that the chief executive officer, Al Copeland, would not have allowed the money to be spent on Samaras' build-to-suit restaurants because it would have been counterproductive to the company. Kilbourne recommended to Flynn that Samaras be offered something else to fulfill AFC's obligation and suggested either cash or existing restaurant franchises.

Bill Copeland, the chief operating officer, testified that although it was suggested that Samaras might want to explore the possibility of accepting existing restaurants, Samaras was never told not to submit designated sites for the build-to-suit restaurants, which was the first step in the build-to-suit process. Flynn testified, however, that the company assisted in this step of the process by providing the aid of the company's real estate representatives. Samaras testified that this aid was never offered and he did not seek such aid or pursue designating sites due to the negative response he had already received.

Upon Samaras' termination in January of 1990, AFC sent him a letter detailing its final obligations to him. The letter reserved the issue of the build-to-suit restaurants, and Samaras spoke with AFC's newly-appointed chief operating officer, Carl Hays, to confirm that his rights with regard to the company's build-to-suit obligation were not being waived. Samaras then proceeded in an effort to reach an acceptable compromise to AFC's original build-to-suit obligation by considering existing restaurants. On July 12, 1990, Samaras sent a letter to Al Copeland venting his frustration over AFC's unresponsive stance to proposed restaurant locations. Finally, when Samaras received a letter from AFC dated August 30, 1990, stating that further negotiations would be futile, Samaras filed the action from which the instant appeal is taken.

## ARGUMENTS ON APPEAL

In this appeal, AFC raises nine points of error contending: (1) the evidence was legally and factually insufficient to support the trial court's conclusion that the contractual provision sought to be enforced was sufficiently definite to be enforceable; (2) the trial court erroneously excluded certain questions from the jury charge and also included an erroneous instruction therein; (3) the evidence was legally and factually insufficient to support the jury's actual damage award; and (4) federal bankruptcy law precludes the recovery of attorney's fees and post-judgment interest.

### 1. Enforceability of Contract

In its first point of error, AFC maintains the trial court erred in overruling its motions for judgment n.o.v. and for new trial because there was no evidence or insufficient evidence that the contractual provision Samaras sought to enforce was sufficiently definite to make it an enforceable obligation. AFC asserts that essential terms of the obligation were uncertain or left open for future negotiations.

### a. Standard of Review

■ AFC couches its point of error in terms of an evidentiary review; however, we do not find this to be the appropriate stan-

2. AFC had acquired the Church's Fried Chicken chain in the fall of 1988, and the daily debt service was approximately $160,000.00.

**622**

dard of review. The parties do not dispute the existence of the agreement or that the letter agreement obligated AFC to provide Samaras with two build-to-suit restaurants. *See Central Texas Micrographics v. Leal*, 908 S.W.2d 292, 297 (Tex.App.—San Antonio 1995, no writ)(when the existence of a term is disputed, a question of fact is raised subject to sufficiency review). Rather, the issue in the instant case is whether the language expressly set forth in the letter agreement relating to this obligation was sufficiently definite to be enforceable against AFC.

A contract is not enforceable unless the court can determine the parties' legal obligations and liabilities. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex.1992); *Gannon v. Baker*, 830 S.W.2d 706, 709 (Tex.App.—Houston [1st Dist.] 1992, writ denied); *University Nat'l Bank v. Ernst & Whinney*, 773 S.W.2d 707, 710 (Tex.App.—San Antonio 1989, no writ). In order to be enforceable, therefore, the parties must have agreed on the material terms. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d at 221. If an essential term is left open for future negotiation, the contract is not binding. *Id.; Cap Rock Elec. Co-op., Inc. v. Texas Utilities Elec. Co.*, 874 S.W.2d 92, 99 (Tex.App.—El Paso 1994, no writ).

"Whether an agreement is legally enforceable or binding is a question of law." *Texaco, Inc. v. Pennzoil Co.*, 729 S.W.2d 768, 814 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.), *cert. dism'd*, 485 U.S. 994, 108 S.Ct. 1305, 99 L.Ed.2d 686 (1988). The jury may not be called upon to construe the legal effect of an agreement or to supply an essential term upon which the parties did not mutually agree. *Id.; see also University Nat'l Bank v. Ernst & Whinney*, 773 S.W.2d at 710. Therefore, we conclude that the issue of whether an agreement fails for indef-

initeness is a question of law to be determined by the court.[3]

A trial court's legal conclusions are always reviewable on appeal, and the appellate court is not obligated to give any particular deference to those conclusions. *Purvis Oil Corp. v. Hillin*, 890 S.W.2d 931, 935 (Tex.App.—El Paso 1994, no writ). Rather, the appellate court, as final arbiter of the law, is required to independently evaluate the trial court's legal determinations. *Id.* A trial court's legal conclusions will not be reversed on appeal unless they are erroneous as a matter of law. *Hofland v. Fireman's Fund Ins. Co.*, 907 S.W.2d 597, 599 (Tex.App.—Corpus Christi 1995, no writ).

In construing an agreement, the court may consider evidence of circumstances surrounding its execution. *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 731 (Tex.1981); *Medical Towers, Ltd. v. St. Luke's Episcopal Hosp.*, 750 S.W.2d 820, 823 (Tex.App.—Houston [14th Dist.] 1988, writ denied). Furthermore, a trial court is permitted to construe words and terms in an agreement as such terms are usually understood by persons in the profession, business or industry. *See KMI Continental Offshore Production Co. v. ACF Petroleum Co.*, 746 S.W.2d 238, 241 (Tex.App.—Houston [1st Dist.] 1987, writ denied); *Dorchester Gas Producing Co. v. Harlow Corp.*, 743 S.W.2d 243, 249 (Tex.App.—Amarillo 1987, writ vacated); *cf. Atlantic Richfield Co. v. ANR Pipeline Co.*, 768 S.W.2d 777, 783 (Tex.App.—Houston [14th Dist.] 1989, no writ)(discussing supplementation or explanation by usage of trade under Tex. Bus & Com.Code § 2.202). The trial court should also consider the contractual language in light of the experience of the parties and their familiarity with the meaning of techni-

---

**3.** Although AFC agreed during oral argument that the issue of indefiniteness appeared to be a question of law, AFC asserted that it used the legal and factual sufficiency standards of review based on the Texas Supreme Court's decision in *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex.1992). The court of appeals in *T.O. Stanley Boot Co.*, however, concluded that there was no binding agreement as a matter of law. *Bank of El Paso v. T.O. Stanley Boot Co.*, 809 S.W.2d 279, 289 (Tex.App.—El

Paso 1991), *aff'd in part, rev'd in part*, 847 S.W.2d 218 (Tex.1992). The Texas Supreme Court then reviewed the material terms of the contract in light of the evidence presented and also concluded that it failed for indefiniteness. *T.O. Stanley Boot Co.*, 847 S.W.2d at 221–22. Therefore, although the Court was responding to a "no evidence" point of error, we believe the Court reviewed the court of appeals' determination as to the definitiveness of the contract as a legal conclusion.

cal terms used in the business or industry. *Pace Corp. v. Jackson,* 155 Tex. 179, 284 S.W.2d 340, 347 (1955); *Dorchester Gas Producing Co. v. Harlow Corp.,* 743 S.W.2d at 249–50; *Sumners v. Hohenberger,* 356 S.W.2d 804, 805–06 (Tex.Civ.App.—San Antonio 1962, writ ref'd n.r.e.).

Where the evidence shows that the parties intended to enter into an agreement, the courts should find the contract to be definite enough to grant a remedy provided that there is a certain basis for determining the remedy. *See Texas Oil Co. v. Tenneco,* 917 S.W.2d 826, 830 (Tex.App.—Houston [14th Dist.] 1994, writ granted)(citing RESTATEMENT (SECOND) OF CONTRACTS). Uncertainty of terms may preclude one remedy without affecting others. *Id.* For example, more certainty is necessary in an action for specific performance than is necessary in an action for damages. *Pace Corp. v. Jackson,* 284 S.W.2d at 345; *Tenneco,* 917 S.W.2d at 830.

As Samaras asserts in his brief, AFC's representative acknowledged at trial that the letter agreement imposed an obligation on AFC to provide two build-to-suit restaurants at the times designated with all franchise fees waived. The term "build-to-suit" was defined as a standard industry term requiring AFC to acquire land in a market selected by Samaras subject to AFC's review and approval and to construct a building thereon to suit Samaras. There was further evidence at trial that the building would be constructed from two basic sets of plans which were patented by AFC depending upon the size of the site.

AFC argued that notwithstanding the industry definition of the term "build-to-suit," the letter agreement was uncertain because the amount, duration and repayment terms under the lease agreement were not established and the franchise agreement was not negotiated. With respect to the franchise agreement, however, it appears from the testimony introduced at trial that a new franchisee, such as Samaras, was not permitted to negotiate the terms of the franchise

agreement, but was required to accept the form as contained in the Uniform Franchise Offering Circular. This requirement was based on federal and state securities laws which would preclude a more favorable offering to an insider in the absence of express disclosures by AFC.

The more compelling aspect of AFC's argument relates to the repayment terms under the lease agreement. Under a build-to-suit arrangement, AFC would acquire the land, build the structure and lease it back to Samaras for a term of twenty years. The lease rate would be based on a discounted cash flow rate sufficient to enable AFC to recover the cost of the acquisition and construction. In addition, if the structure was built using funds obtained through a loan from a bank or other outside financial institution, the discounted cash flow rate would also include an amount sufficient to cover the interest rate payable on such loan. Alternatively, if the structure was built using internal funds, the discounted cash flow rate would include a market rate of return.

At the time the letter agreement was signed, it was not determined whether AFC would finance the build-to-suit restaurants internally or externally. Furthermore, a market rate of return is based on the market at the time in question, and the ability to determine that market rate in advance would be highly questionable. At trial, Samaras testified the market rate of return at the time the build-to-suit restaurants were to be undertaken was around 12%. Samaras later testified the lease percent would be around 9–11%. Jim Flynn testified the rate of return would be 10–12%. Lewis Kilbourne testified the "profit margin" on build-to-suit was 12–13%. Finally, John Drinen, AFC's representative at trial, testified the rate would be 12–15%.

The law favors finding agreements sufficiently definite for enforcement, particularly in this instance where Samaras had already provided the services for which the compensation was to be paid.[4] *See Tanen-*

---

4. Having been given the benefit of Samaras' services, AFC now seeks to deny Samaras the full compensation package he was promised. We

note that were we to hold the build-to-suit obligation unenforceable as a matter of law, AFC could arguably avoid any similar commitment

baum Textile Co. v. Sidran, 423 S.W.2d 635, 637 (Tex.Civ.App.—Dallas 1967, writ ref'd n.r.e.); see also ERC Mortgage Group, Inc. v. Luper, 32 Ark.App. 19, 795 S.W.2d 362, 364 (1990)(noting policy disfavoring nonenforcement of contract due to uncertainty under Arkansas law). Where parties have entered into an agreement containing all essential terms except price, courts have been willing to presume a reasonable price was intended and have held that the absence of the price term does not cause the contract to fail for indefiniteness. See Bendalin v. Delgado, 406 S.W.2d 897, 900 (Tex. 1966); Pennington v. Jerry F. Gurkoff, D.O., P.A., 899 S.W.2d 767, 770 (Tex.App.— Fort Worth 1995, writ denied). Similarly, we hold that the contract to provide two build-to-suit restaurants should not fail because the parties did not set forth the market rate of return which would be included in determining the lease amount in the event internal financing was used. A reasonable market rate of return can be implied. Therefore, we find "[t]he contract was about as definite and certain as the parties could have made it under the circumstances, and it was sufficiently definite and certain to furnish a basis for arriving with reasonable certainty at the minimum damages which [Samaras] would suffer by reason of [AFC's] breach."[5] Pace Corp. v. Jackson, 284 S.W.2d at 347.

## 2. Jury Charge

The trial court submitted one broad-form question to the jury regarding AFC's alleged breach, specifically: "Did Al Copeland Enterprises, Inc. fail to comply with paragraph C of the June 15, 1988 agreement (Plaintiff's Exhibit 3)?" Accompanying this question was the following instruction:

In answering this question, consider what the parties, at the time of the agreement, intended the words "The company will provide you with two build-to-suit restaurants (land and building)" to mean. In determining the intended meaning of those words, consider all the fact and circumstances surrounding the making of the agreement, the interpretation placed on the agreement by the parties, and the parties' conduct, and the custom and usage in the industry.

The trial court also submitted a four-part question regarding whether AFC's failure to comply was excused by ratification, waiver, repudiation or estoppel, which were all raised as affirmative defenses in AFC's amended original answer.

In points of error two through five, AFC contends that the trial court erred in refusing to submit certain questions and in including the foregoing instruction.

### a. Standard of Review

■ An abuse of discretion standard is employed to review error in a charge. Texas Dep't of Human Services v. E.B., 802 S.W.2d 647, 649 (Tex.1990); H.E. Butt Grocery Co. v. Bilotto, 928 S.W.2d 197, 199 (Tex.App.— San Antonio 1996). The trial court abuses its discretion by acting arbitrarily, unreasonably or without consideration of guiding rules and principles. Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241–42 (Tex.1985), cert. denied, 476 U.S. 1159, 106 S.Ct. 2279, 90

made to other employees. We further note that in the event Samaras had breached the agreement, AFC would not likely have believed itself barred from enforcing the contract on the basis that uncertainty in the build-to-suit obligation rendered the entire agreement unenforceable.

5. This is not a case where the lease payment is the consideration being given in exchange for the obligation undertaken by the other party as in T.O. Stanley Boot Co. v. Bank of El Paso, 847 S.W.2d 218, 221 (Tex.1992), wherein the amount of interest paid was determinative of whether the bank would agree to loan money. Rather, in this case, the value of Samaras' services was the consideration given to AFC in exchange for the various benefits Samaras was to receive from

AFC. We believe that if the value of Samaras' services to AFC was dependent upon the rate of return used in determining the amount of the lease payment in connection with the build-to-suit undertaking, AFC would have ensured that such rate of return was expressly set forth in the agreement. Thus, we question whether the rate of return under the build-to-suit obligation can be considered an "essential term" in this arrangement; however, we hold that if it is an essential term, the rate of return can be implied so that paragraph C of the letter agreement sufficiently defines the build-to-suit obligation with reasonable certainty, thereby enabling Samaras to recover damages for its breach.

L.Ed.2d 721 (1986); *Bilotto,* 928 S.W.2d 197, 199. "[A] clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion...." *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992); *Bilotto,* 928 S.W.2d at 199.

 A trial court is required to submit a cause to the jury upon broad-form questions whenever feasible; provided that the questions fairly submit the disputed issues raised by the pleadings and evidence for the jury's determination. TEX.R. CIV. P. 277; *see also Neuro–Developmental Associates of Houston v. Corporate Pines Realty Corp.,* 908 S.W.2d 26, 28 (Tex.App.—Houston [1st Dist.] 1995, writ denied). A trial court has considerably more discretion when submitting instructions than when submitting questions. *Perez v. Weingarten Realty Investors,* 881 S.W.2d 490, 496 (Tex.App.—San Antonio 1994, writ denied). Nevertheless, TEX.R. CIV. P. 277 states that the court shall submit such instructions "as shall be proper to enable the jury to render a verdict." An explanatory instruction that is a correct statement of the law as applicable to the facts is proper. *Riggs v. Sentry Ins.,* 821 S.W.2d 701, 705 (Tex.App.—Houston [14th Dist.] 1991, writ denied). Even if an instruction contains a correct statement of law, however, the trial court should refuse to submit it where the instruction is unnecessary. *Id.*

### a. Inclusion of Terms

 In its second point of error, AFC contends the trial court erred in refusing to submit a question inquiring as to whether the parties intended the contractual provision at issue, paragraph C of the letter agreement, to include the following terms: (a) that AFC would provide financing to Samaras to pay for two Popeye's franchise restaurants; (2) that Samaras would have the option to submit locations of build-to-suit restaurants for AFC's approval; (3) that upon site selection, AFC and Samaras would negotiate the lease agreements; and (4) that Samaras would be required to sign and comply with franchise agreements.

AFC argues that its requested issue was proper citing 4 TEX. PATTERN JURY CHARGES § 101.01 (1990 & Supp.1992–93)(hereinafter cited as "PJC") and *Scott v. Ingle Bros. Pac., Inc.,* 489 S.W.2d 554 (Tex.1972). AFC concedes, however, that it was difficult to "reconcile *Scott* and PJC §§ 101.01–02 with *Stanley Boot,* which appears to hold that questions of uncertainty and indefiniteness of terms are matters of law for a court."

AFC's argument in reliance on PJC § 101.01 ignores the additional comments contained under that section. The comment entitled "Essential Terms" notes that a failure to include all essential terms renders a contract unenforceable. PJC § 101.01, comment. We have already held that whether an agreement is legally enforceable or binding is a question of law, and a jury may not be called upon to supply an essential term upon which the parties did not mutually agree. *Texaco, Inc. v. Pennzoil Co.,* 729 S.W.2d at 814; *University Nat'l Bank v. Ernst & Whinney,* 773 S.W.2d at 710. The caveat to the "Essential Terms" comment in PJC § 101.01 notes that where omitted terms are supplied by application of law, no issue as to the terms of the agreement should be submitted.

In addition, AFC's reliance on *Scott* is also misplaced because the question there held to be factual related to the existence of an agreement. *See Scott,* 489 S.W.2d at 554–55; *see also Leal,* 908 S.W.2d at 297. In the instant case, the parties do not dispute the existence of the agreement, nor do they dispute the terms contained therein. Rather, the dispute concerns whether the terms contained in the agreement constitute all the essential terms necessary to make the obligation sufficiently definite to be enforceable, which is a question of law to be determined by the court.

The question AFC requested would have asked the jury to interpret the legal effect of the contractual language. The trial court did not abuse its discretion in refusing to submit such a question. *See Medical Towers, Ltd. v. St. Luke's Episcopal Hosp.,* 750 S.W.2d at 825–26 (noting that presenting a question of law to a jury is erroneous).

### b. Anticipatory Repudiation

 In its third point of error, AFC complains of the trial court's failure to submit

anticipatory repudiation as the controlling issue in the case rather than the failure to comply issue that the trial court submitted.[6] AFC contends the case was tried on the issue of anticipatory repudiation and asserts that the issue submitted "merely preordained an obvious answer to an uncontested issue."

■ Samaras alleged in his petition that AFC's refusal to honor its obligations was an "express breach and/or and an anticipatory breach." Even assuming AFC had repudiated the agreement in the instant case, the law is well-settled in Texas that when one party repudiates a contract, the other party may then elect to either (1) accept the repudiation and bring a suit to recover damages for its breach; or (2) treat the repudiation as inoperative and sue for damages as they accrue when the time for performance under the contract is due. *See Pollack v. Pollack,* 39 S.W.2d 853, 857 (Tex.1931)(noting measure of damages where suit is based on anticipatory breach); *Greenwall Theatrical Circuit Co. v. Markowitz,* 97 Tex. 479, 79 S.W. 1069, 1071 (1904)(holding that upon repudiation of a contract by one party, the other party must make his choice between the two available courses); *Thomas v. Thomas,* 902 S.W.2d 621, 624 (Tex.App.—Austin 1995, writ denied)(holding anticipatory repudiation and breach of contract to be inconsistent rights); *Lufkin Nursing Home, Inc. v. Colonial Inv. Corp.,* 491 S.W.2d 459, 463 (Tex.Civ.App.—Amarillo 1973, no writ)(holding that filing of suit after time for performance constitutes election to hold repudiating party responsible

for consequences of nonperformance). Since the time for performance had passed in the instant case, Samaras clearly was entitled to sue for breach of contract and to elect to have the issue submitted to the jury as an express breach or failure to comply. AFC, on the other hand, was not entitled to dictate the remedy Samaras sought to pursue. *See King v. Lindley,* 697 S.W.2d 749, 751 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.)(defendant may not dictate remedy plaintiff pursues). Therefore, the trial court did not abuse its discretion in refusing to submit anticipatory breach as the controlling issue.

### c. Condition Precedent

Samaras pled in his petition that at all times he stood ready, willing and able to perform his obligations under the agreement and that he had complied with all conditions precedent. Having plead such performance, Samaras was only required to prove that he had complied with such conditions precedent as AFC specifically denied. Tex.R. Civ. P. 54. AFC asserted in its amended answer that Samaras "never tendered his performance which was a condition precedent, or alternatively, a covenant necessary before [AFC] was obligated to perform."

■ In its fourth point of error, AFC contends the trial court erred in refusing to submit a question asking whether Samaras failed to comply with a condition precedent to the alleged agreement.[7] In order to address

---

**6.** We note the trial court did submit a defensive issue as to whether AFC's performance was excused by Samaras' repudiation.

**7.** AFC presented three different questions regarding condition precedent. The first request read as follows:

*Jury Question No. 1*
 *Instruction*
 You are instructed that on June 15, 1988, George Samaras and Al Copeland Enterprises, Inc., agreed that Al Copeland Enterprises, Inc. would provide two build-to-suit restaurants (land and building) with franchise fees waived to George Samaras conditioned upon the following:
 A. Submission of mutually acceptable sites by George Samaras;
 B. Arms length negotiations between George Samaras and Al Copeland Enterprises to arrive

at terms that would pay back the costs of acquisition and construction together with a reasonable rate of return to Al Copeland Enterprises, Inc.; and,
 C. George Samaras' signing of Standard Franchise Agreements binding him to all standard franchise obligations except payment of franchise fees for the two restaurants.
 *Jury Question*
 Do you find from a preponderance of the evidence that George Samaras performed all of the conditions as set forth above?
 The first alternative requested issue read as follows:
*Alternative Jury Question No. 1*
 *Instruction*
 Do you find from a preponderance of the evidence that on or about June 15, 1988, George Samaras and Al Copeland Enterprises, Inc. agreed that Al Copeland Enterprises, Inc.

this issue, we must first determine whether Samaras' tender of performance was a "condition precedent," as alleged by AFC.

■ A condition precedent is either a condition to the initial formation of a contract or a condition to an obligation to perform an existing agreement. *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex.1976); *see also Graco Robotics, Inc. v, Oaklawn Bank,* 914 S.W.2d 633, 640 n. 2 (Tex.App.—Texarkana 1995, writ dism'd); *but see Rincones v. Windberg,* 705 S.W.2d 846, 848 (Tex.App.—Austin 1986, no writ)(holding condition to obligation to perform was a condition subsequent). In the instant case, AFC's pleading contends that AFC's obligation to perform under the letter agreement, specifically its obligation to provide Samaras with the build-to-suit restaurants, was conditioned upon Samaras' tender of performance. AFC did not plead nor contend that the tender of performance was a condition precedent to the initial formation of the agreement.

In its proposed jury questions, AFC set forth three conditions that it contended Samaras would have been required to meet before AFC's obligation to perform would arise. These three conditions were: (1) the submission of mutually acceptable sites by Samaras; (2) arms-length negotiations between Samaras and AFC to arrive at terms that would pay back the costs of acquisition

and construction together with a reasonable rate of return; and (3) execution of a Standard Franchise Agreement binding Samaras to all standard franchise obligations except payment of franchise fees.

With regard to the first alleged condition precedent, Jim Flynn testified at trial that the company had a concurrent obligation in designating sites to provide the assistance of its real estate representatives. Therefore, in order to designate the sites, the company would have had to cooperate with Samaras. AFC's second alleged condition precedent negotiations between AFC and Samaras, would also require AFC's concurrent cooperation. Finally, AFC would have to produce the Standard Franchise Agreement before Samaras could be called upon to execute it.

■ Conditions are disfavored in the law, and where a condition would impose an absurd or impossible result, the agreement is to be interpreted as creating a covenant rather than imposing a condition. *Hohenberg Bros. Co.,* 537 S.W.2d at 3. In light of the concurrent obligations of both AFC and Samaras with respect to each of the alleged conditions precedent, we conclude the alleged conditions were actually covenants to be performed during the course of fulfilling the build-to-suit obligation. Therefore, the trial court did not abuse its discretion in refusing to submit the requested issue as to condition precedent.[8]

---

would provide two build-to-suit restaurants (land and building) with franchise fees waived conditioned upon the following:

A. Submission of mutually acceptable sites by George Samaras:
Answer:

B. Arms length negotiations between George Samaras and Al Copeland Enterprises to arrive at terms that would pay back the costs of acquisition and construction together with a reasonable rate of return to Al Copeland Enterprises, Inc.; and
Answer:

C. George Samaras' signing of Standard Franchise Agreements binding him to all standard franchise obligations except payment of franchise fees for the two restaurants.
Answer:

*Alternative Jury Question No. 2*
Do you find from a preponderance of the evidence that George Samaras performed all of the conditions precedent in Special Issue No. ___?

The second alternative requested jury issue read as follows:
*Alternative Jury Question No. 3*
 *Instruction*
 A condition precedent may be either a condition to the formation of a contract or to an obligation to perform an existing agreement. A condition precedent may relate to either the formation of a contract or to liability under them. Conditions precedent to an obligation to perform are acts or events that are to occur after the contract is made and that must occur before there can be a right to immediate performance and before there can be a breach of contractual duty.
 *Jury Question No. 3*
 Do you find from a preponderance of evidence, that the Plaintiff performed all conditions precedent to the contract with ACE?

8. We note the trial court did submit AFC's requested issue regarding repudiation which would encompass any alleged failure by Samaras to perform the covenants.

#### d. Instruction Regarding Intended Meaning of Contractual Language

In its fifth point of error, AFC argues that since there was no ambiguity pled, the trial court erred in submitting the following instruction with the failure to comply jury question:

In answering this question, consider what the parties, at the time of the agreement, intended the words "The company will provide you with two build-to-suit restaurants (land and building)" to mean. In determining the intended meaning of those words, consider all the facts and circumstances surrounding the making of the agreement, the interpretation placed on the agreement by the parties, the parties' conduct, and the custom and usage of the industry.

The submitted instruction is patterned from 4 TEX. PATTERN JURY CHARGES § 101.08 (1990 & Supp.1992–93) ("PJC"). PJC § 101.08 is intended to be used as an instruction where the court determines the agreement contains an ambiguous provision. PJC § 101.08, comment. The submission of the instruction in the instant case confuses the issues of ambiguity and indefiniteness. "Ambiguity results when the intention of the parties is expressed in language susceptible of more than one meaning, but when a contract is silent, the question is not one of interpreting the language but rather one of determining its effect." *Medical Towers, Ltd. v. St. Luke's Episcopal Hosp.,* 750 S.W.2d at 822. As previously noted, a jury may not be called upon to construe the legal effect of an agreement. *Texaco, Inc. v. Pennzoil Co.,* 729 S.W.2d at 814.

AFC is correct in contending that ambiguity was not pled in the instant case. Rather, the issue as to the contractual language was whether it was sufficiently definite to be enforceable which we have held to be a question of law. Therefore, the instruction submitted in connection with the failure to comply question was not necessary since the trial court was called upon to determine the legal effect of the contractual language as a matter of law. The submission of a question of law to a jury, however, is not considered harmful error unless extraneous prejudice is shown.

*Medical Towers, Ltd. v. St. Luke's Episcopal Hosp.,* 750 S.W.2d at 826. The jury must have decided the language was sufficiently definite to enable the jury to determine that AFC had failed to comply with its obligations arising thereunder. Since we have determined that the contract was sufficiently definite, the jury's application of the instruction to the submitted issue was consistent with the court's resolution of the issue, and no extraneous prejudice can be shown. *See id.*

### 3. Damage Findings

In its sixth and seventh points of error, AFC contends the evidence was legally and factually insufficient to support the jury's actual damage award. Specifically, AFC argues the evidence was not sufficiently certain and non-speculative to support the lost profits and residual value amounts. In addition, AFC contends the evidence did not support a finding that the damages sought resulted from the breach alleged by Samaras.

In considering a "no evidence" or legal sufficiency point, we consider only the evidence favorable to the decision of the trier of fact and disregard all evidence and inferences to the contrary. *Wal–Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 326–27 (Tex.1993); *Weirich v. Weirich,* 833 S.W.2d 942, 945 (Tex.1992). Under this test, there must be some evidence to support the jury finding, either directly or inferentially. *Wal–Mart Stores, Inc. v. Alexander,* 868 S.W.2d at 327. If there is more than a scintilla of evidence to support the finding, the no evidence challenge must fail. *Stafford v. Stafford,* 726 S.W.2d 14, 16 (Tex.1987). Evidence that a reviewing court may have discounted if serving as a jury cannot be judicially erased from the record. *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex.1993).

In considering a factual sufficiency point, we are required to review all of the evidence; however, we may not pass on the credibility of the witnesses or the weight given their testimony, and we may not interfere with the jury's resolution of conflicts in the evidence. *Lawson–Avila Constr., Inc. v. Stoutamire,* 791 S.W.2d 584, 594 (Tex.App.—San Antonio 1990, writ denied). Where conflicting evi-

dence is presented, we are not called upon to reweigh the evidence; thus, the jury's verdict on such matters is generally considered to be conclusive. *Sanchez v. Guerrero*, 885 S.W.2d 487, 491 (Tex.App.—El Paso 1994, no writ); *see also* William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 TEX. L. REV. 515, 525–526 (1991). We will uphold the jury's finding so long as the evidence supporting that finding is not so weak as to make the finding clearly wrong or manifestly unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

 Loss of profits damages need only be proven with reasonable certainty, and the rule regarding such proof is intended to be flexible so as to accommodate the various circumstances in which claims for lost profits arise. *Texas Instruments, Inc. v. Teletron Energy Management, Inc.*, 877 S.W.2d 276, 279 (Tex.1994). "What constitutes reasonably certain evidence of lost profits is a fact intensive determination." *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex.1992). Where estimates are based on objective facts or data and there are firm reasons to expect a business to yield a profit, recovery is not prohibited simply because the enterprise is new. *See Texas Instruments, Inc.*, 877 S.W.2d at 280; *Holt Atherton Indus., Inc.*, 835 S.W.2d at 84. It is the activity that is the enterprise, and if the activity is well-established, the fact that a newly formed entity is engaging in the activity will not preclude recovery. *Texas Instruments, Inc.*, 877 S.W.2d at 280.

Each of the parties presented expert testimony as to the amount of profits Samaras could have made over a twenty year period and the residual value of the restaurants. The damage model presented by Samaras' expert took into account the historical operations of Popeye's franchises, the potential for failure of a new franchise and the factors upon which he based his evaluation of the likelihood of Samaras' success, including Samaras' experience in the industry. The historical data on the franchise operations provided an intelligent objective basis for Samaras' damage model, and we find the testimony of Samaras' expert provided more

than a scintilla of evidence to support the jury's damage award.

Each side questioned certain assumptions made in the other party's damage model. The jury was free to weigh this evidence in light of the various issues raised as to each party's model. The jury did not unquestioningly accept the testimony of Samaras' expert but reduced the amount of damages presumably based on certain challenges made by AFC to the expert's model. We are not called upon to reweigh the evidence, and we do not find that the evidence supporting the jury's finding is so weak as to make the finding clearly wrong or manifestly unjust. The requirement of "reasonable certainty" was met, and the damage model and testimony are based on evidence showing a firm reason to expect Samaras would have profited in the franchise activity.

With respect to AFC's seventh point of error, AFC asserts that the amount of damages awarded by the jury presumes AFC breached its obligation to provide Samaras with rights under two franchise agreements, but AFC argues there is no evidence of any demand for these rights separate from the demand for the build-to-suit restaurants. AFC's argument ignores, however, that the franchise agreements were to be used in conjunction with the build-to-suit restaurants not independently. This was the fundamental agreement of the parties as reflected in paragraph C of the letter. We conclude that AFC's argument is without merit.

## 4. Attorney's Fees and Post–Judgment Interest

In its eighth and ninth points of error, AFC raises two challenges to the award of attorneys' fees and post-judgment interest. In its ninth point of error, AFC contends that if we set aside the award of actual damages, the attorney's fees and post-judgment interest awards also must be set aside. Since we have overruled AFC's contentions with respect to the actual damage award, AFC's ninth point of error is also overruled.

 AFC's eighth point of error raises an issue as to whether Samaras is precluded from recovering attorney's fees and post-judgment interest under applicable bankruptcy law. The issue presented is whether

**630**

the claim for attorney's fees and post-judgment interest contained in the trial court's judgment should be allowed or disallowed under the bankruptcy laws. The trial court refused to rule on the issue questioning its authority to decide the issue under bankruptcy law. AFC, however, argues that the bankruptcy court gave the trial court the jurisdiction to decide the issue. We disagree.

Each of the code sections and cases cited by both parties address the allowance and disallowance of such claims in bankruptcy. The allowance and disallowance of a bankruptcy claim is considered a core proceeding under federal bankruptcy law, and the bankruptcy court retains exclusive jurisdiction over such claims. *In re Wood,* 825 F.2d 90, 97 & n. 35 (5th Cir.1987); *Warren v. Calania Corp.,* 178 B.R. 279, 281 (M.D.Fla. 1995). Although the validity of a bankruptcy claim may be determined by a state court and a bankruptcy court may allow a state court to proceed to judgment in order to liquidate a claim, the allowance or disallowance of the claim after liquidation is within the bankruptcy court's exclusive jurisdiction. *In re Ford,* 967 F.2d 1047, 1050 (5th Cir. 1992); *In re Comstock Financial Services, Inc.,* 111 B.R. 849, 859 (Bankr.C.D.Cal.1990). Exclusive jurisdiction rests in the bankruptcy court because it retains exclusive *in rem* jurisdiction over the property of the bankruptcy estate, and only the bankruptcy court can ensure the equitable distribution of the estate to all the estate's creditors by consistently determining which claims are to be allowed and disallowed. *In re Comstock Financial Services, Inc.,* 111 B.R. 849, 859 (C.D.Cal.1990).

Therefore, we agree with the trial court that it did not have the jurisdiction to rule on the issue of whether federal bankruptcy law disallows the recovery of attorney's fees and post-judgment interest. AFC's ninth point of error is overruled.

## CONCLUSION

The judgment of the trial court is affirmed.