United States Court of Appeals
Fifth Circuit

**F I L E D**

**May 27, 2004**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT

———————————————

No. 03-10834

———————————————

DEVIN MALONE,

Plaintiff-Appellee,

versus

ARIBA, INC.

Defendant-Appellant.

———————————————————————————————————————

Appeal from United States District Court
for the Northern District of Texas
3:00-cv-02706

———————————————————————————————————————

Before JONES, DENNIS and PICKERING, Circuit Judges.

CHARLES W. PICKERING, SR., Circuit Judge:[*]

Appellant Ariba, Inc. appeals a judgment based on *quantum meruit* in favor of Devin

Malone. For the reasons stated, we affirm in part, reverse in part and vacate and remand to the

district court for further proceedings consistent herewith.

FACTS

Devin Malone ("Malone") was employed by Ariba, Inc. ("Ariba") as a salesman from

April 1999 through September 2000.[1] Ariba was, at that time, a relatively new startup computer

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be
published and is not precedent except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

[1] Malone was placed on employment probation on June 23, 2000, by his supervisor, Michael Faulks, for
erratic and unproductive work habits and entered into an agreed plan to remedy his work deficits. He was

software company concentrating on the development, licensing and implementation of computer software to companies to showcase their products and/or services in electronic marketplaces. Malone had worked in various sales and support positions with other software companies for approximately ten years prior to his employment with Ariba. He was employed in Ariba's Texas office and most of his work was performed in Texas.

As a condition of employment, Malone was required to execute a one page compensation agreement entitled "Account Manager - 1999 Compensation Plan," (the "1999 Plan").[2] The 1999 Plan contained Malone's compensation and reimbursement structure including figures for his base salary, sales quotas, commission percentages and expense allowances and reimbursement amounts. This plan was specifically made subject to the "1999 Sales Compensation Plan Guidelines." However, there is no document with that title, and trial testimony revealed that this document was actually entitled "Fiscal Year 1999 Sales Compensation Plan." All parties and the district court referred to the one page "Account Manager-1999 Compensation Plan" document as the "1999 Plan" and the "Fiscal Year 1999 Sales Compensation Plan" as the "1999 Guidelines." For consistency and clarity, this Court will retain the usage of those designations. This court will likewise use similar designations for the 2000 counterpart documents.

When Ariba's fiscal year ended on September 30, 1999, Malone was required to execute a new compensation agreement, the "Account Manager-2000 Compensation Plan" (the "2000 Plan"), and he did so on October 6, 1999. This plan differed from the 1999 Plan in that it

ultimately involuntarily terminated on September 29, 2000. He has not alleged any claims for wrongful termination.

[2] Ariba designated salesmen as "Account Managers."

2

increased his sales quotas and changed the amounts of and the way his commission percentages were applied to sales. This plan was made subject to the "2000 Sales Plan Compensation Guidelines." The trial testimony revealed that, as in the case of the 1999 Guidelines, there was no document by this name but that the document which was in fact intended was the "FY 2000 Sales Compensation Plan" (the "2000 Guidelines"). However, this document was in the drafting and revision stages when Malone executed the 2000 Plan. Ariba contended that the 2000 Guidelines were completed and distributed by October 14, 1999. Malone contended that he never saw nor received the 2000 Guidelines. The trial judge found that "Ariba created the 2000 Guidelines document months later," after the execution of the 2000 Plan.

On February 29, 2000, Ariba closed the sale of a major software deal with Sabre, Inc. Malone was the initiator of this sale and had worked on it for several months prior to the closing. Sabre was a major player in the airline and travel industry and had previously purchased a competing product. The closing of this sale was seen as a major *coup d'etat* for Ariba. Most of the deal was structured as non-refundable, with $2.065 million for an internal use license and one year's maintenance; $6.0 million non-refundable revenue for two reseller licenses with an additional $1.2 million due thereon, one-half in 2001 and one-half in 2002; and $1.0 million for two IBX licenses with return contingency through September 18, 2000.

The trial testimony revealed that Sabre paid an initial $9.065 million cash to Ariba by April 2000 and that the money was deposited into Ariba's general account. There was conflicting testimony regarding whether the $6.0 million portion of the revenue attributable to the reseller licenses had ever been recognized for financial statement purposes as of the time of trial. Malone was paid commissions only on the $2.065 million component and the $1.0 million IBX

3

component.[3]  His total commission payments amounted to $116,550.00.[4]

Ariba denied that Malone was entitled to a commission on the $6.0 million non-refundable revenue for the reseller licenses so he filed suit in the Northern District of Texas on December 13, 2000, for that commission.  After discovery, a three day bench trial was conducted commencing February 27, 2003.  The district court concluded that Malone was entitled to that commission plus pre- and post-judgment interest, attorneys' fees and costs under the theory of *quantum meruit*.  Finding of Facts and Conclusions of Law and a Final Judgment consistent with the district court's conclusions were entered by the court on July 21, 2003.  Feeling aggrieved by the ruling, Ariba timely filed the instant appeal.

STANDARD OF REVIEW

The district court's conclusions of law are subject to *de novo* review.  *See  Chandler v. City of Dallas*, 958 F.2d 85, 89 (5th Cir. 1992).  Questions of fact are reviewed for clear error.  *Id.* "In *Anderson v. City of Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) the Supreme Court elucidated the standard of review contained in Federal Rule of Civil Procedure 52(a), which mandates that '[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of [sic] the credibility of the witnesses.'" *Matter of Complaint of Luhr Bros., Inc.,* 157 F.3d 333, 337 (5th Cir. 1998).  "Rule 52(a) requires greater deference to the trial

---

[3]  In July 2000, Malone was required to execute an amended compensation plan which was retroactive to April 1, 2000.  This plan increased his sales quotas and reconfigured the calculation matrix for his commissions.  Malone's commission on the IBX license revenue of $1.0 million was computed under this revised commission matrix as its return contingency did not expire until September 18, 2000.

[4]  A portion of his commission payment was for a 1% "win back" bonus about which there is no dispute.

4

court's findings when they are based upon determinations of credibility." *Id.* at 338 (quoting *Anderson*, 470 U.S. at 575, 105 S.Ct. at 1512).

"[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id*. at 337-38 (quoting *Anderson*, 470 U.S. at 573, 105 S.Ct. at 1511). "The appellate court must accept the district court's account of the evidence if it is plausible when viewed in light of the entire record. Moreover, '[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.'" *Id.* at 338 (quoting *Anderson*, 470 U.S. at 574, 105 S.Ct. at 1511) (and citing *Henderson v. Norfolk Southern Corp.*, 55 F.3d 1066, 1069 (5th Cir.1995)).

## ESSENTIAL CLAIMS AT TRIAL

Malone's original Complaint and Amended Complaints contained claims for breach of contract, *quantum meruit*, promissory estoppel, declaratory judgment, breach of duty of good faith and fair dealing, fraud and negligent misrepresentation. The trial judge concluded that there was no contract between the parties and denied relief on the breach of contract claim as well as all other theories except *quantum meruit*. Under that theory, the trial judge awarded Malone a judgment for $727,230.00 using the commission percentages from the 2000 Plan to calculate the damages, plus pre- and post-judgment interest, attorneys' fees and costs.

Ariba contended at trial that the $6.0 million in revenue received from the sale of the reseller licenses was not commissionable because Ariba's "Guidelines" policy required that such revenue be recognizable for financial statement purposes before it became commissionable. Ariba referred to this as its "Revenue Recognition Policy." Ariba's stated rationale for this policy was

that such sales often required additional post-sale effort on the part of the salesman to assist the purchaser in reselling the license and that such a policy gave an incentive to the salesman to exert this additional effort in order to ensure the receipt of a commission. Ariba makes this argument in spite of the fact that the $6.0 million payment for the reseller licenses was non-refundable.

The 2000 Plan executed by Malone on October 6, 1999, did not contain any terms of the Revenue Recognition Policy. It did state that "Commissionable Revenue credit does not apply to incomplete orders or orders with contingencies, as determined by CFO and stated in FY00 Sales Compensation Plan." The Revenue Recognition Policy was contained in the 2000 Guidelines - a/k/a FY00 Sales Compensation Plan. The Chief Financial Officer (CFO), Edward Kinsey, also testified that sales of reseller licenses were considered contingent until the licenses were ultimately resold and placed with an end user.

The trial testimony revealed that contracts for the sale of these types of reseller licenses were often modified or amended from their original terms. Indeed, numerous executives with Ariba, including the controller and CFO, testified that contracts that included a prepayment for reseller licenses were usually renegotiated, amended or terminated regardless of whether or not the original contract provided that the revenue was non-refundable, as was the case here.[5]

There was substantial testimony at trial that Ariba's Revenue Recognition Policy was in conformity with generally accepted accounting principles (GAAP) for the software industry. From the testimony, there apparently had been a history of abuse in the industry with companies

---

[5] Sabre, in fact, filed an arbitration action against Ariba on the sale which is the subject of this litigation in 2001 for the alleged failure of Ariba to properly assist Sabre in reselling the licenses and for allegedly attempting to circumvent Sabre's efforts to resell them. The parties settled the arbitration proceeding with an $840,000.00 cash payment from Ariba to Sabre and an extension of the maintenance agreements on the licenses. The trial judge ruled that this did not affect the original sale and Malone's entitlement to commissions thereon.

overstating income by immediately recognizing revenue from the sale of these types of licenses and then having to restate income when the original contracts were renegotiated or prepayments were refunded. Thus, Ariba argues that it was required to formulate and maintain its Revenue Recognition Policy as stated in order to conform to GAAP and satisfy its financial auditors and reviewers of its SEC 10k filings.

TEXAS LAW ON CONTRACTS

Under Texas law, "[p]arties form a binding contract when the following elements are present: (1) an offer, (2) an acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding." *Komet v. Graves*, 40 S.W.3d 596, 600 (Tex. App.-San Antonio 2001, no writ); *McCulley Fine Arts Gallery, Inc. v. X Partners*, 860 S.W.2d 473, 477 (Tex. App.-El Paso, 1993, no writ)). "[P]arties may agree upon certain contractual terms and leave other matters for later negotiations." *Frank B. Hall & Co., Inc. v. Buck*, 678 S.W.2d 612, 629 (Tex. App. -Hous.(14 Dist.), 1984)(*cert. denied*, 472 U.S. 1009 , 105 S.Ct. 2704 , 86 L.Ed.2d 720 (U.S.Tex. Jun 10, 1985) (NO. 84-1639)).

"Moreover, parties to a contract may expressly provide that new matters or terms will be incorporated or interpreted along with the existing contract when those matters or terms are agreed upon." *Id.* However, "when an essential term of a contract is left open for future negotiations [] there is no binding contract, only an agreement to agree." *X Partners*, 860 S.W.2d at 477. "Whether an agreement is legally enforceable or binding is a question of law." *America's Favorite Chicken Co. v. Samaras*, 929 S.W.2d 617, 622 (Tex. App.-San Antonio, 1996, writ denied).

<u>TRIAL COURT FINDING ON EXISTENCE OF CONTRACT</u>

The district court held that the one-page 2000 Plan was not a valid contract as it did not address the timing of the commission payments and that such was an essential term of the contract, vis-a-vis, when the commission payments would be made in regard to the recognition of the revenue. The court concluded that the 2000 Guidelines did contain such terms, but that Malone did not agree to be bound by them as they were not in existence at the time he signed the 2000 Plan and he never received a copy of them. Ariba contends that this was clear error.

<u>ARGUMENTS ON APPEAL</u>

Ariba makes two principal points in its argument that the district court committed error by concluding that the timing of commission payments was a missing essential element of the one-page 2000 Plan negating the conclusion that it could form the basis of a contract between the parties. Ariba first contends that the 2000 Plan did in fact contain language regarding the timing of commission payments, i.e., that such commission payments were due in the next pay cycle following receipt of payment from the customer. Second, even in the absence of a specific timing of payment term, timing of commission payments could be inferred within a reasonable time because Texas law requires performance of a contract in a reasonable time if no time for performance is set out. *See Koch Industries, Inc. v. Sun Co.*, Inc., 918 F.2d 1203, 1209 n.3 (5th Cir. 1990). Ariba also argues that the 2000 Guidelines were incorporated into or amended the contract (the 2000 Plan) by providing that commission payments were not payable until the income was recognized for financial statement purposes by Ariba.

On appeal, Malone first argues that the district court's judgment based on *quantum meruit* was correct. Even though he did not file a cross-appeal, he alternatively agrees with Ariba that the

8

language which required the payment of commissions in the next pay cycle following receipt of payment from Sabre is sufficiently specific to constitute a valid and binding term as to the timing of Ariba's commission payment obligation on the $6.0 million component.[6]  This he may properly do. "[A]n appellee is under no obligation to take a cross-appeal if he wishes to offer alternative bases, other than those employed by the district court, to support the judgment entered below." *Spurlin v. General Motors Corp.*, 531 F.2d 279, 280 (5th Cir. 1976) (quoting 9 J. Moore, *Federal Practice*, P204.11(3), at 932).  *See also Lowe v. Pate Stevedoring Co.*, 558 F.2d 769, 770, n.2 (5th Cir. 1977).

### THERE WAS A CONTRACT

We disagree with the district court's conclusion that there was no valid and binding contract between the parties and find that the one page document entitled the Account Manager - 2000 Compensation Plan (the "2000 Plan") was a valid contract.  It contained all the essential terms of a binding agreement.  The trial evidence clearly established that there was an offer, an acceptance, a meeting of the minds on the basic terms of the contract, that each party consented to the basic terms and that the contract was executed and delivered.  "Where the evidence shows that the parties intended to enter into an agreement, the courts should find the contract to be definite enough to grant a remedy provided that there is a certain basis for determining the remedy." *America's Favorite Chicken*, 929 S.W.2d at 623.  "The law favors finding agreements sufficiently definite for enforcement, particularly [where one party has] already provided the services for which the compensation was to be paid." *Id.* at 623-24 (citing *Tanenbaum Textile Co. v. Sidran*, 423 S.W.2d 635, 637 (Tex. Civ App.-Dallas, 1967, writ ref'd n.r.e.)).

---

[6]  Malone does not agree with Ariba, however, that the 2000 Guidelines became a part of the contract.

The district court concluded that the timing of commission payments was an essential term not contained in the 2000 Plan, hence, no contract. However, the document states "[c]ommission payments are due in the next pay cycle following the receipt of payment from customers." The evidence is clear that both parties intended to enter into an employment contract. They did, and Malone performed services under that contract. *See Komet v. Graves,* 40 S.W.3d at 601 (noting that in determining whether there is a meeting of the minds, "[c]ourts look to the communication between the parties, as well as the acts and circumstances surrounding the communications.") (internal citation omitted).

We conclude that the provision "[c]ommission payments are due in the next pay cycle following receipt of payments from customers" is sufficiently definite to enforce the understanding of the parties as to when commissions are due. The district court erred as a matter of law by finding that the one-page 2000 Plan did not contain a sufficiently definite term governing the timing of commission payments.

<u>EFFECT OF THE 2000 GUIDELINES ON MALONE</u>

The next issue is what is the effect of the 2000 Guidelines on Malone? The district court concluded that Malone did not assent to the 2000 Guidelines because they were not in existence at the time Malone executed the 2000 Plan, and he did not thereafter receive a copy of them or even know of their existence.

It is undisputed that the 2000 Plan contains language sufficient to incorporate the 2000 Guidelines therein. What is open to dispute is whether the 2000 Guidelines existed at a time and in a manner sufficient for Malone to be charged with notice and knowledge of them.

10

A.  When were the 2000 Guidelines created?

Even though Malone executed the 2000 Plan indicating that he had received, reviewed and accepted the Guidelines, it is undisputed that these Guidelines were not in existence at the time Malone signed the 2000 Plan on October 6, 1999.  Malone testified unequivocally that he never received them prior to the February 29, 2000, Sabre closing.  Ariba challenged this testimony. Testimony from Ariba executives Mireya Bravomalo, the revenue recognition and commissions manager for 1999, and CFO Kinsey revealed that the 2000 Guidelines were a revision of the 1999 Guidelines and were revised and available to sales people by October 14, 1999.  However, employees other than Malone testified that they had not seen nor were they aware that the 2000 Guidelines were completed or available until the summer of 2000.

Adam Brenner, another account manager, testified that he inquired whether there was "anything else" that went along with the Plan when he executed his 2000 Plan in the fall of 1999 and was told "no."  Malone's immediate supervisor, Tom Pallack, testified that he was the one who would have received the Guidelines from Stephanie Kamp and provided them to Malone.  He stated that he did not recall seeing them before mid-2000, but that no one had requested a copy of them and if they had, he would have referred them to his secretary, whom he assumed would have had access to them at some point.

Stephanie Kamp testified that she was the Ariba executive in charge of sales operations and responsible for distributing the document to the sales force supervisors and that she did not receive the revised 2000 Guidelines nor distribute them at any point prior to their additional revision and distribution in June 2000.  A hard copy of the 2000 Guidelines document was produced and

11

admitted at trial with a date stamp of February 17, 2000. The testimony established that this was the earliest date stamped copy that could be located.

A review of that document indicates that it may, in fact, never have been completed. There is language in the document that indicates that certain sections were incomplete and subject to further review and continued revision by designated Ariba personnel. The conclusion that the document was not completed until much later than October 14, 1999, is also supported by the e-mail exhibits in evidence that indicate additional work was necessary even after Bravomalo and Kinsey testified the document was completed. There is one place near the end of the document that ends in mid-sentence with no punctuation.

As previously stated, the trial judge concluded that the document was not created until "months later." Based on the disputed evidence as to when the Guidelines were completed and the credibility decisions necessarily implicit in that finding, the court concludes that the district court's finding on this issue was not clearly erroneous.

B. Did the Parties mutually assent to the 2000 Guidelines?

Ariba argues that the 2000 Guidelines were incorporated into or amended the 2000 Plan, thereby providing that commission payments were not payable until the income was recognized for financial statement purposes by Ariba. The district court, however, concluded that there was no mutual assent to the 2000 Guidelines prior to the February 29, 2000, closing of the Sabre sale not only because the 2000 Guidelines were not completed until months after the execution of the 2000 Plan, but also because Malone never received them and thus could not assent to be bound by them. Thus, the district court held that the 2000 Guidelines were not incorporated into the 2000 Plan.

Under Texas law, "[e]ither party to an employment-at-will relationship may impose

12

modifications to employment terms." *Burlington Northern R. Co. v. Akpan*, 943 S.W.2d 48, 50

(Tex. App.-Ft.Worth, 1996)(citing *Hathaway v. General Mills, Inc.*, 711 S.W.2d 227, 229

(Tex.1986)).  Of course, one party cannot unilaterally remake the contract between the parties.

*See Kitten v. Vaughn*, 397 S.W.2d 530, 533 (Tex. Civ. App.-Austin, 1965).  If either party to an

employment arrangement wishes to modify the terms of that employment,

> [t]he party asserting the modification must prove that it unequivocally notified the other party of definite changes in the employment terms and the other party's acceptance of those changes. When an employer notifies an employee of such changes, the employee must accept the new terms or quit. If the employee continues to work with knowledge of the changes, he has accepted the changes. To have knowledge of the changes, the employee must know the nature of the modifications and the certainty of their imposition.

*Burlington Northern*, 943 S.W.2d at 50.

As discussed earlier, there was ample evidence to support the district court's finding that

the 2000 Guidelines were not in existence at the time the employment contract was executed and

that the 2000 Guidelines were not created until "months later."  Malone testified that he never

received a copy of the 2000 Guidelines.  Further testimony also supported a finding that Malone

was not on notice of the 2000 Guidelines' provisions prior to closing the Sabre deal.  For instance,

Malone testified that he contacted his immediate supervisor, Tom Pallack, about the

commissionability of the Sabre sale prior to closing on February 29th, and Pallack told him that

when Sabre paid Ariba, Malone would be paid his commission on the full amount received by

Ariba.  Pallack's testimony confirmed this understanding of Ariba's commission policy, and he also

testified that he confirmed his understanding of this policy with Paul Melchiorre, Ariba's Vice

President of North American Operations in February 2000.  Malone also testified that he

understood from Pallack and Ariba practices that if the sale was structured so as to be non-

13

refundable, it would make him eligible for his commission on the entire portion which was so structured in the next pay period after Sabre paid. He therefore negotiated the bulk of the sale as non-refundable so that he would be ensured of receiving his commission from most of the sale.

Although the question of Malone's notice or knowledge of the 2000 Guidelines was hotly disputed and there was contrary testimony on this issue, the district court's finding that there was no mutual assent to the 2000 Guidelines was plausible in light of the record. It is of no moment that the district court reached this conclusion in a different context. The district court properly reviewed the disputed testimony surrounding the formation of the 2000 Guidelines and the notice and knowledge of Malone regarding them and reached the conclusion that he did not assent to them. This was a proper exercise of the fact finding function of the court to determine the intent of the parties. *See America's Favorite Chicken*, 929 S.W.2d at 625. This court, allowing the district court the deference to which it is entitled, does not find that decision to be clearly erroneous. Thus the 2000 Guidelines never became a part of the contract between Ariba and Malone.

## MEASURE OF DAMAGES

In the face of a valid and binding contract, was the district court in error in awarding damages under a theory of *quantum meruit*? Under Texas law, one may recover under an equitable or *quantum meruit* theory only "in the absence of an express contract covering the services or materials furnished." *See Jackson v. Houston Independent School Dist.*, 994 S.W.2d 396, 401 (Tex. App.-Hous. (14 Dist), 1999) (citing *Vortt Exploration Co., Inc., v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990); *Hebert v. Greater Gulf Coast Enterprises, Inc.*, 915 S.W.2d 866, 872 (Tex. App.-Hous. (1 Dist.), 1995)). This court finds that there was a

14

contract between the parties; therefore, under Texas law, it was inappropriate for the district court to award damages under a *quantum meruit* theory.[7] The judgment of the district court must be reversed on its judgment awarding damages under the theory of *quantum meruit.*.

WAS THERE AN AMBIGUITY?

We have concluded, as a matter of law, that there was a binding contract between Ariba and Malone. Further, we have affirmed the district court's conclusion that the 2000 Guidelines never became a part of that contract because Malone never received and thus never assented to them. In doing so, we found that the provision in the contract "[c]ommission payments are due in the next pay cycle following receipt of payment from customers" was a sufficient statement of when the commissions were due to make the contract enforceable. This provision seems to be clear and mandatory language as to when commissions would be paid by Ariba. In other words, when the customer paid Ariba, Ariba would pay Malone's commission in the next pay cycle.

However, the Court notes that the contract has two other provisions relating to payment of commissions. "Bookings with contingencies do not qualify for commissionable revenue credit" and "[c]ommissionable revenue credit does not apply to incomplete orders or orders with contingencies, as determined by CFO and stated on the FY00 Sales Compensation Plan." These two contract provisions appear to modify, or attempt to modify the clause that the "[c]ommission payments are due in the next pay cycle following receipt of payment from customers." In view of the fact that under Texas law "it is well established that where an ambiguity exists in a contract, the contract language will be construed strictly against the party who drafted it since the drafter is

---

[7] As the court has concluded that it was inappropriate to award damages under a *quantum meruit* theory, it is unnecessary to address Ariba's argument on the sufficiency of the evidence supporting that award.

15

responsible for the language used," *Gonzalez v. Mission American Ins. Co.*, 795 S.W.2d 734, 737 (Tex. 1990)(citing *Republic Nat. Bank of Dallas v. Northwest Nat. Bank of Fort Worth,* 578 S.W.2d 109 (Tex. 1978)), these three clauses may or may not create an ambiguity.[8]  Nevertheless, this issue can best be resolved by the district court on remand.[9]

### CONCLUSION

Since this Court has concluded that there was a valid and binding contract between the parties, the district court's award based on *quantum meruit* was error and must be, and is hereby REVERSED.  This matter is REMANDED to the district court to resolve the questions relating to whether there was or was not an ambiguity in the contract, to determine if there was a breach of the contract, and if so, the damages caused by the breach.  The district court is AFFIRMED in all other respects.

In conformity with the foregoing opinion, this case is AFFIRMED IN PART, VACATED and REMANDED IN PART.

---

[8]"Ambiguity results when the intention of the parties is expressed in language susceptible of more than one meaning, . . ." *America's Favorite Chicken,* 929 S.W.2d at 628 (quoting *Medical Towers, Ltd. v. St. Luke's Episcopal Hosp.*, 750 S.W.2d 820, 822 (Tex. App.-Hous. (14 Dist.), 1988, writ denied)).

[9]The issue of ambiguity was raised both in the Amended Complaint and in the Pretrial Order.