**CENTRAL TEXAS MICROGRAPHICS,**
Appellant,

v.

**Charlie R. LEAL, Appellee.**

No. 04–94–00581–CV.

Court of Appeals of Texas,
San Antonio.

Sept. 20, 1995.

Terrence J. Martin, Edward T. Hecker, Martin & Strolle, P.C., San Antonio, for appellant.

J. Vince Hightower, San Antonio, for appellee.

Before CHAPA, C.J. and HARDBERGER and DUNCAN, JJ.

## OPINION

CHAPA, Chief Justice.

### Nature of the Case

This is an appeal from a jury verdict on breach of contract and promissory estoppel claims. The jury awarded appellee actual damages in the amount of $36,375 and attorney fees of $22,500, and awarded appellant $1,042.27 on a claim for unreimbursed salary and expenses owed by appellee. The trial court directed a verdict in appellant's favor on a fraud charge. Appellant appeals on fifteen points of error[1] on legal and factual insufficiency grounds. Appellee brings three cross-points.

### Background

Appellee, Charlie Leal, worked for appellant Central Texas Micrographics (CTM) and its president and sole shareholder, Lang Glotfelty, as a salesman selling Kodak products from February 1990 until November 1991, when Kodak terminated its contract with CTM. When CTM decided to sue Kodak and its codefendant, Micro Images, Leal continued to work for CTM to prepare for the litigation. After a year and a half, Kodak and then Micro Images settled with CTM for a total of $1.1 million dollars. From November 1991 until August 1992, Leal worked fulltime for CTM, organizing its records for litigation, attending depositions for CTM, and serving as primary liaison between CTM and its attorneys. According to Leal, the initial oral employment agreement had the following terms:

—Leal would work fulltime on the Kodak litigation

—Leal would be paid by CTM $3,000 per month

—Leal would receive an unspecified share of the proceeds of the litigation. Leal contends the amount was left unspecified at the suggestion of CTM's attorneys and with CTM's knowledge to enhance the value of his testimony at trial that he had no enforceable agreement to share in the proceeds.

In August 1992, Leal took a fulltime position in Austin, but continued to work parttime for CTM on the litigation. In October 1992, Leal moved to Houston to be with his seriously ill mother. He offered to resume his fulltime duties with CTM, which CTM accepted. This time the employment agreement was memorialized in writing on October 14, 1992. It included the $3,000 per month

---

1. The argument and authorities portion under each of appellant's points of error are largely repetitive. We remind appellant to heed the dictates of Tex.R.App.P. 74(f), which states: "Repetition or prolixity of statement or argument must be avoided."

salary, but did not mention the share in any litigation proceeds. On advice of counsel, Leal was named a vice president of CTM so he could represent the company at depositions. Leal testified that Glotfelty alluded frequently to Leal's sharing in the litigation proceeds. Leal worked nights, days, and weekends from October 1992 until March 1993, when they went to trial against Micro Images. Kodak had settled with CTM in February 1993 for $875,000. Leal testified that he did not take any vacation in 1993 because they were so busy preparing for the litigation. There was testimony that Glotfelty promised to take Leal and a companion, as well as several other people including his attorney, to Cancun when the trial was over.

After they had been in trial for two weeks, on March 25, 1995, Glotfelty, his wife, and Leal met at the Travelodge. Leal testified that Glotfelty expressed a desire to press on with the litigation, and named $50,000 as the heretofore unspecified bonus. Glotfelty testified that he had by this time decided to settle with Micro Images, because an offer of approximately $200,000 was on the table, and contended that he offered Leal $25,000 as a bonus. They settled the case the next day. Within a few days, Leal began asking Glotfelty for the money because he needed it for his dying mother. Glotfelty sent him checks for $5,000 each on April 21, 28, and June 6, writing "loan" on two of them. Leal testified he gave Glotfelty an undated invoice for $50,000 and that Glotfelty did not question the amount; Glotfelty denied this. When Leal asked repeatedly for the money, Glotfelty told him that he had to wait until the accounting was settled and fees paid, and made other excuses. The accountant for CTM's attorney testified that Glotfelty had 99.5% of the settlement monies by May 24, 1993. Soon Leal was no longer able to reach Glotfelty by phone, although he called repeatedly. On July 1, 1993, Leal wrote a letter to Glotfelty asking for the remaining money owed. Receiving no response, he wrote a demand letter on July 14. He filed suit in October. Glotfelty testified that he would have paid Leal the remaining $10,000 of the $25,000 had Leal not filed suit.

## Analysis

■ In considering a "no evidence" or legal sufficiency point, we consider only the evidence favorable to the decision of the trier of fact and disregard all evidence and inferences to the contrary. *Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex.1988); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex. 1965). If there is more than a scintilla of probative evidence in the record which supports the jury's answers, the court may not disregard the jury's findings. *Penwell v. Barrett,* 724 S.W.2d 902, 905 (Tex.App.—San Antonio 1987, no writ). In considering a factual sufficiency point, we may not substitute our judgment for that of the jury, but must assess all the evidence and reverse for a new trial only if the challenged finding is so against the great weight and preponderance of the evidence as to be manifestly unjust, shocking to the conscience, or clearly demonstrating bias. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). "In considering an 'insufficient evidence' point, we must remain cognizant of the fact that it is for the jury, as the trier of fact, to judge the credibility of the witnesses, to assign the weight to be given their testimony, and to resolve any conflicts or inconsistencies in the testimony." *Commonwealth Lloyd's Ins. Co. v. Thomas,* 678 S.W.2d 278, 289 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.); *accord Texas Employers' Ins. Ass'n v. Jackson,* 719 S.W.2d 245, 249–50 (Tex. App.—El Paso 1986, writ ref'd n.r.e.).

### a. Unpaid Vacation

■ In points of error one, four, and five, appellant CTM contends there is no evidence of consideration to support the trial court's submission of Question 1(b), and there is no evidence or factually insufficient evidence to support the jury's findings on Question 1(b), which asked: "Did W. Lang Glotfelty on behalf of Central Texas Micrographics agree: (b) to allow Charlie R. Leal a reasonable amount of paid vacation during his employment in 1993 with Central Texas Micrographics?" The jury answered "yes" and awarded $375.00.

The testimony revealed that Leal received $3,000 a month according to the contract and was a vice president of CTM during the time in question. Both Leal and CTM's lead attorney for the Micro Images trial testified that Leal worked long hours, including weekends, during the first three months of 1993, and the attorney testified that he told Leal and Glotfelty that Leal's presence was necessary during this time and that Leal could not take any time off due to the pressures of preparing for litigation. Both Leal and Glotfelty testified that the CTM company policy provided for a two-week paid vacation after one year's employment. Although CTM entered into evidence copies of Leal's wages as reported on Internal Revenue Service 1099 forms, indicating that Leal was paid on a "contract labor" basis, there was no testimony that this form of payment necessarily precluded paid vacation time. The jury's award of $375 for unused vacation for three months' labor, based on a monthly salary of $3,000, is both legally and factually supported by the record. Appellant's points of error one, four, and five are overruled.

**b. Cancun Trip**

■ In points of error one, six, and seven, appellant argues that there is no evidence of consideration to support the trial court's submission of Question 1(c), and there is no evidence or factually insufficient evidence to support the jury's findings on Question 1(c), which asked: "Did W. Lang Glotfelty on behalf of Central Texas Micrographics agree: (c) to provide as a work incentive an expense paid vacation for Charlie R. Leal and his companion to Cancun, Mexico?" The jury answered "yes" and in Question 3 awarded $2,000, which was reduced in the judgment to $1,000, the figure mentioned in testimony.

The evidence revealed that Glotfelty on numerous occasions told Leal that he would take him on a trip to Cancun with a companion as a reward for working hard on the litigation. Glotfelty also testified that he would have taken Leal on the trip, except that Leal could not get a date (which Leal denied). Glotfelty also made this same promise to his attorney and to the attorney's secretary, who expressed "disappointment"

when she did not receive the trip. We agree with appellant that this was nothing more than a gratuitous promise unsupported by consideration. Leal did not perform any additional work other than that which he had already contracted to perform, and therefore there was no consideration to support the promise. *See Smith v. Renz*, 840 S.W.2d 702 (Tex.App.—Corpus Christi 1992, writ denied) (consideration a fundamental element of every contract). We reverse that part of the judgment awarding $1,000 for the Cancun trip.

**c. The Bonus**

In points of error one, eight, and nine, CTM contends that there is no evidence of consideration to support the trial court's submission of Question 4, and there is no evidence or factually insufficient evidence to support the jury's findings to Question 4, which asked how much CTM agreed to pay Leal. The jury answered, $50,000.

CTM contends that there was insufficient consideration for the bonus, which both Leal and Glotfelty agreed was discussed on March 25, 1993, because Leal provided no new consideration for the bonus; that Leal "performed no duties which he was not already bound to do under the written employment agreement [and] he did what he did every other morning preparing for the trial." By this argument CTM asserts that no contract for the bonus existed until March 25. Indeed, it asserts that the promise to give the additional amount of money now disputed was merely a gift given in gratitude. Leal, on the other hand, insists that the bonus was a part of an original agreement which predated the written document by almost a year, and was purposely left out of the written contract to bolster the reliability of his testimony at trial. Thus, Leal contends that the issue is not a lack of consideration, but, rather, a lack of definiteness to the contract.

■ "A contract, whether written or oral, must define its essential terms with sufficient precision to enable the court to determine the obligations of the parties. Courts cannot make contracts for the parties and an agreement to enter into negotiations in the future cannot be enforced because the

court has no means to determine what sort of contract the negotiations would have produced." *Weitzman v. Steinberg,* 638 S.W.2d 171, 175 ((Tex.App.—Dallas 1982, no writ) (citations omitted); *see University Nat'l Bank v. Ernst & Whinney,* 773 S.W.2d 707, 710 (Tex.App.—San Antonio 1989, no writ). Moreover, the general rule is that no enforceable contract exists "where the agreement of the parties leaves an essential term for later determination *and it is never determined.*" *Mooney v. Ingram,* 547 S.W.2d 314, 317 (Tex.Civ.App.—Dallas 1977, writ ref'd n.r.e.) (emphasis added); *accord Wiley v. Bertelsen,* 770 S.W.2d 878, 882 ((Tex.App.—Texarkana 1989, no writ).

▇ We agree with Leal that the issues presented in this case are whether there is sufficient evidence to prove that a contractual provision providing for a bonus existed, and whether the contract between the parties was too indefinite regarding the bonus to be enforced. When the issues so presented are disputed, they are questions for the jury. *See Utilities Natural Gas Corp. v. Hill,* 239 S.W.2d 431, 436 (Tex.Civ.App.—Dallas 1951, writ ref'd n.r.e.) (whether oral agreement to pay commission on sale contract negotiated by plaintiff existed is question for jury); *Ingram v. Gentry,* 205 S.W.2d 673, 675 (Tex. Civ.App.—Waco 1947, no writ). In *Ingram,* a contractor alleged an oral contract in which he was to receive both an hourly wage as a laborer, which was undisputed, and a ten percent commission on the total payroll. In overturning a directed verdict for the appellees who alleged no contract had been made, the court of appeals concluded that the contractor's testimony as the sole witness was sufficient to justify a jury finding that a contract had been made and that he was entitled to recover the commission. *Id.* at 675.

Leal testified that in November 1991, he and Glotfelty entered into an oral agreement in which Leal would devote his full time to the litigation efforts in exchange for a $3,000 a month salary and an unspecified share in the proceeds of the litigation. This fulltime employment was modified in August 1992, when he accepted a sales position in Austin and continued to work parttime on the litiga-

tion. The salary was modified to reflect this parttime effort. When Leal was forced to move to Houston to attend his sick mother, he entered into an agreement with appellant to return to fulltime employment on the litigation. At this time, on October 14, 1992, Leal sent an "Employment Proposal" to Glotfelty which memorialized the salary of $3,000 a month, specified the days Leal would travel to San Antonio, and dealt with reimbursement of travel expenses. The document also stated:

> The salary that I am asking is what it will take me to take care of my obligations. I think you will agree that I am capable of earning a lot more. I am not trying to hit oil on this, I am simply trying to propose a "liveable" scenario. It is for only four months, until the trial. *The ramifications of winning the trial are obvious to both of us.* (emphasis added).

Leal testified that at the time it was initially decided in 1991 that Leal would devote all his time to the litigation, Glotfelty asked him to figure the least amount of monthly salary he could accept, and that they would "share the rewards" if they prevailed in the case. He further testified that Glotfelty made many verbal allusions to Leal's sharing in the proceeds throughout the time they worked together on the litigation. Mr. Glotfelty testified, "I told him that if we won big, we might all make some money." We conclude that the foregoing evidence is both legally and factually sufficient to allow the jury to conclude that Glotfelty, acting on behalf of CTM, agreed to pay a bonus to Leal in exchange for his work on the litigation.

▇ It is undisputed that at the time the agreement was entered into, the amount of the bonus was unspecified. Therefore, at that time the contract was unenforceable, because an essential term was undetermined. *See Mooney,* 547 S.W.2d at 317. However, this essential term was established on the evening of March 25, 1993, when Leal and Glotfelty met and discussed the amount of Leal's bonus. The sole remaining issue is whether the amount of the bonus was $25,000 or $50,000. The jury found that the amount promised was $50,000. The principal evidence before the jury regarding the amount

was the testimony of the three people present at the meeting: Leal, Mr. Glotfelty, and Mrs. Glotfelty. Leal testified clearly and unequivocally that Glotfelty named $50,000 as the amount of the bonus, which was twenty-five percent of the Micro Images settlement amount on the table at the time and that he accepted this figure. He also testified that he later gave Glotfelty an invoice for $50,000, which Glotfelty looked at and pocketed without comment, and which was entered into evidence. Reviewing only the evidence and reasonable inferences tending to support the jury's finding and disregarding all evidence and inferences to the contrary, we conclude that there is legally sufficient evidence to support the jury's finding.

Turning to a factual review, the record reveals that, to the contrary, both Mr. and Mrs. Glotfelty testified that Mr. Glotfelty offered Leal $25,000, which they characterized as a gift, for his assistance in the litigation. Glotfelty denied receiving the invoice for $50,000 from Leal. Glotfelty in his pleadings admitted to making a "gratuitous promise" to pay a $25,000 "bonus." In addition, Mrs. Glotfelty was emphatic that her husband "absolutely" agreed to give Leal $25,000 at the March 25 meeting. She also testified that her husband had paid Leal $15,000, "which is 60 percent of what he owed him." Both testified that appellant would have paid Leal the balance on the $25,000 had Leal not filed a lawsuit. There was also testimony from attorneys associated with the Kodak and Micro Images litigation regarding their perceptions on the truthfulness and credibility of Glotfelty and Leal, including testimony from Glotfelty's attorney that both he and his secretary had been promised trips to Cancun at the conclusion of the litigation which never materialized. The comptroller for one of the law firms utilized by appellant also testified regarding his financial dealings with Mr. Glotfelty.

■■■ The jury is the sole judge of the credibility of the witnesses, and we may not substitute our judgment for theirs. *See Pool*, 715 S.W.2d at 635; *Commonwealth Lloyd's*, 678 S.W.2d at 289. Moreover, the trier of fact has the duty to weigh the evidence, draw inferences from the facts, and

choose between conflicting inferences. *Ramo, Inc. v. English*, 500 S.W.2d 461, 467 (Tex.1973). Based on an examination of the record, we conclude that the evidence is not so weak that the finding of an agreement to pay $50,000 to Leal is clearly wrong or manifestly unjust. *Pool*, 715 S.W.2d at 635. Appellant's first, eighth, and ninth points of error are denied.

### d. Detrimental Reliance

In its second and tenth through thirteenth points of error, appellant asserts that there is no evidence of detrimental reliance to support the submission of Question 5 regarding promissory estoppel, and there is no evidence or factually insufficient evidence to support the jury's findings of Leal's detrimental reliance and the award of damages. Leal pleaded promissory estoppel and detrimental reliance as an alternative to his breach of contract claim. Assuming arguendo that no enforceable contract existed between the parties, we conclude that Leal's recovery could be affirmed under this alternative theory as well. The jury found that Leal relied to his detriment on Glotfelty's promises, and that such reliance was foreseeable, and awarded Leal $50,000.

■■■ The elements of promissory estoppel are: (1) a promise, (2) foreseeability of reliance on the promise by the promisor, and (3) substantial detrimental reliance by the promisee. *English v. Fischer*, 660 S.W.2d 521, 524 (Tex.1983). In a claim for promissory estoppel, only reliance damages are allowed. *Fretz Constr. Co. v. Southern Nat'l Bank*, 626 S.W.2d 478, 483 (Tex.1981). The evidence shows that at the beginning of the Kodak litigation Glotfelty asked Leal to figure the least monthly amount that Leal could live on, because if CTM prevailed in its litigation the proceeds would be shared; that Leal in his proposed employment contract limited his monthly salary to a lesser amount than he could earn in anticipation of winning the trial; that in the few years prior to going to work for appellant, Leal earned approximately $60–65,000 annually; that Glotfelty mentioned sharing in the profits in conversations; that Glotfelty admitted that he told Leal he might share in the proceeds of the litigation.

The evidence also revealed that Leal worked for one and one half years on the litigation, and continued to work on it even though employed for a short while in Austin. We conclude that there is legally and factually sufficient evidence to support the jury's finding of detrimental reliance.

Regarding the reliance damages, Leal worked for one and a half years on the litigation at a salary below what he could have earned—approximately $30,000 per year less. The jury award of $50,000 was approximately one and a half times the difference, i.e., $45,000. Appellant's points of error regarding promissory estoppel are overruled.

### e. Attorney's Fees

In points of error three, fourteen, and fifteen, appellant argues that there is no evidence and insufficient evidence to support the jury's award of $22,500 in attorney's fees. Leal's counsel testified that his reasonable trial fees were $15,000 and reasonable appeal fees would be $7,500. Instead, the jury found $22,500 for trial fees and $0.00 for appeal fees. Therefore, appellant requests that the award be remitted to $15,000. In a cross-point, Leal contends that the trial court should have disregarded the jury's findings on the appellate fees, because there was no evidence to support their finding. Leal asked the trial court to modify the findings, which the court disregarded. He asks that we modify the judgment to award $15,000 for trial fees and $7,500 for appellate fees.

Leal's attorney testified extensively regarding his background, hourly rate, and how he calculated the number of hours spent on the case, how he anticipated the cost of appeal, and the reasonableness of the fees. This evidence was "clear, direct, and positive, and not contradicted by any other witness or attendant circumstances[.]" *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex.1990). We conclude the trial court erred in awarding the fees as found by the jury, and reform the judgment to award appellee $15,000 for trial fees and $7,500 for appellate fees.

### Leal's Cross Points

Leal first contends the trial court erred in granting a directed verdict on his fraud action, because there was evidence of fraud. As evidence he cites that the jury found Glotfelty made numerous commitments that he breached; Glotfelty had made similar promises to other employees that he did not keep, which could be evidence of an intention to obtain commitments from his employees to work on the litigation without ever having an intent to keep his promises; and there was testimony that Glotfelty was not a truthful person. The elements of fraud are: (1) a material representation; (2) that was false; (3) which was known to be false when made or was asserted without knowledge of its truth; (4) which was intended to be acted on; (5) which was relied upon; and (6) which caused injury. *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex.1990), *cert. denied*, 498 U.S. 1048, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991). "A promise to do an act in the future is actionable fraud when made with the intention, design, and purpose of deceiving and with no intention of performing the act." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex.1986). Intent not to perform a promise when it was made may be proved by circumstantial evidence and may be inferred from the party's subsequent acts. *Id.* Although there is ample evidence in the record to show that appellant failed to keep the commitment made to Leal by Glotfelty after March 25, 1993, there was no evidence which showed the promise to pay a bonus was false when originally made or that Glotfelty knew it was false when he made it. *See DeSantis*, 793 S.W.2d at 689. Because the evidence failed to support this element of the fraud cause of action, the trial court did not err in directing a verdict on the fraud claim.

Leal's second and third cross points regarding his promissory estoppel action and attorney's fees have been addressed previously.

### Conclusion

In conclusion, we reverse the trial court's judgment awarding $1,000 for the Cancun trip and render a take-nothing judgment in

favor of appellant as to this element of damages. We reform the award of attorney's fees to $15,000 for trial and $7,500 on appeal. All other aspects of the trial court's judgment are affirmed.