# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
February 28, 2014

Lyle W. Cayce
Clerk

No. 12-20466

METROPLEXCORE, L.L.C.,

Plaintiff - Appellant

v.

PARSONS TRANSPORTATION, INCORPORATED,

Defendant - Appellee

Appeals from the United States District Court
for the Southern District of Texas

Before DEMOSS, DENNIS, and PRADO, Circuit Judges.

PER CURIAM:

This appeal arises from a contracting dispute between Plaintiff-Appellant MetroplexCore LLC, a Texas environmental engineering firm, and Defendant-Appellee Parsons Transportation Group, Inc., an Illinois general contracting firm, which contracted with the Harris County, Texas Metropolitan Transit Authority ("METRO") to design, build, and operate a Houston-area transit system. Parsons had prepared an initial bid to be the lead contractor for the passenger rail line, and the bid had included, among other companies, MetroplexCore as a "team member" responsible for various supervisory and environmental projects. Parsons did not win the bid, and another company began work on the project. Several years later, the initial contractor was unable

No. 12-20466

to proceed with the project, and METRO awarded Parsons the contract for the remainder of the project, along with a new set of Parsons subcontractors. After several months had elapsed, MetroplexCore notified Parsons that it believed it was entitled to a share of the profits. Parsons denied it had an agreement with MetroplexCore, and MetroplexCore filed suit.

The district court granted summary judgment upon determining that no enforceable joint venture agreement existed, and that MetroplexCore could not recover on its alternative claims of fraudulent misrepresentation, promissory estoppel, and quantum meruit. We agree that the summary judgment evidence did not present any genuine issue of material fact as to MetroplexCore's joint venture and quantum meruit claims, and MetroplexCore does not challenge the dismissal of its fraudulent misrepresentation claim on appeal. However, because the district court impermissibly resolved certain disputed questions of fact at the summary judgment stage, and because those facts, taken in a light most favorable to MetroplexCore, would give rise to a claim to relief for promissory estoppel, we AFFIRM in part and REVERSE in part.

## I.

Parsons Transportation Group, Inc., is an engineering and construction corporation incorporated in Illinois, with offices located in Houston, Texas. MetroplexCore, LLC, is a Texas minority-owned environmental engineering company. In 2006, the Metropolitan Transit Authority of Harris County, Texas ("METRO") solicited bids to build a passenger-rail line in Houston. Parsons assembled subcontractors to join it in a venture called the Houston Transit Solutions Team ("HTS Team") with it in bidding. MetroplexCore and Parsons agreed that if the bid were accepted, MetroplexCore would be hired to "manage" the geotechnical and hazardous-material work for the design and development phases and supervision on the project and, according to Parsons, would "participate in that contract to a minimum 10% level."

2

METRO awarded the contract to its first-ranked bidder, the Washington Group Transit Management Company ("Washington Group").  However, on METRO's request, the Parsons team complied and executed an extension agreement providing that its proposal would "remain valid until May 27, 2007." METRO's Request for Qualifications provided that, for "Phase I," although METRO would negotiate with its highest-ranked bidder, "METRO will have the right to terminate unsuccessful discussions and to proceed with discussions with the next highest ranked Offeror."  There was no similar language under the header "Phase II" of the Request.

The Washington Group commenced "Phase I" of the project and worked on it for approximately a year, from May 2007 to April 2008.  MetroplexCore performed some subcontracting work for a group doing work under the Washington Group, "Team Express," during this time, although it had not been a part of Washington's original bid.  However, the Washington Group was unable to maintain its METRO-required qualifications to complete Phase II, and METRO terminated the contract April 29, 2008. METRO then began discussions with Parsons about taking over the contract for Phase II, which was slated to end by 2013.

Ultimately, Parsons won the Phase II contract, and the METRO board passed a resolution permitting it to proceed on the project on March 4, 2009. Parsons did not submit a separate bid to perform the Phase II work, but the parties generally agree that the scope of the project had changed in Phase II as a result of the work that Washington Group did, and that the Phase II contract was at least "based on" Parsons' original bid, even if the specifications and team members had changed somewhat.

It is MetroplexCore's role, or lack of a role, in the Phase II work that is disputed in this appeal.  MetroplexCore argues that Parsons represented that it would have the same role as provided in Parsons' original bid, and that

MetroplexCore and Parsons were joint venturers in the project. However, MetroplexCore did not produce documents substantiating its alleged management or joint venture role in Phase II other than documents relating to Phase I and an email chain discussing MetroplexCore's role or possible role in Phase II. Parsons produced a joint venture agreement it had with its Phase II collaborators, which did not list or mention MetroplexCore. MetroplexCore did not produce a similar joint venture agreement or written document regarding its role, if any, in Phase II.[1]

Instead, MetroplexCore alleges that METRO board members relied on MetroplexCore having a continued role in the contract when the members voted to award Parsons the Phase II contract. James Dixon, a member of the Small and Disadvantaged Business Committee for METRO's board, stated he was "impressed" with Parsons' proposal in part because its inclusion of MetroplexCore "demonstrated a commitment to actually involve a reputable small business not merely as a subcontractor, but actually as a principal or prime partner in the management of the performance under the METRO contract," citing "MetroplexCore's prior good work history . . . and good reputation." He averred that "but for Parsons' oral and written documents assuring [him] and other board members that MetroplexCore would be a significant part of the management team, it is not likely that Parsons would ever have been seriously considered for the project." In addition, MetroplexCore alleges that Parsons Vice-President Sallye Perrin represented, both orally and in writing, that MetroplexCore would be on the "management team" for Phase II.

Parsons denied this allegation, and submitted an affidavit from Perrin in support. Perrin averred that "[t]hroughout 2008 and 2009, Parsons met with

---

[1] MetroplexCore explicitly disavows a theory of recovery based on breach of contract.

many subconsultants, including Metroplex[C]ore, regarding the procurement process for work on the Modified Scope [*i.e.,* Phase II]. During this meeting, [she] communicated the process Metroplex[C]ore would have to go through if it sought to perform any work on the Modified Scope." She further averred that Parsons did not sign any contract with MetroplexCore regarding work to be done on Phase II.

MetroplexCore's officers recalled things differently. In its opposition to Parson's motion for summary judgment, MetroplexCore submitted, among other evidence, affidavits of MetroplexCore's President and former Chief Operating Officer, Zia Qureshi, and sole shareholder, Willard Jackson, that contradicted Perrin's statements in her affidavit. Qureshi averred that Perrin repeatedly assured her and other MetroplexCore personnel that "Parsons was going to honor its oral and written commitment that MetroplexCore be a management partner now that the [Phase II] contract was in place." She and other MetroplexCore personnel described in detail the assurances and meetings MetroplexCore had with Parsons. Qureshi stated in her affidavit, "Perrin made repeated assurances . . . regarding MetroplexCore's work on the management team. MetroplexCore was asked to provide a matrix of work and services to be provided or managed under the Parsons/METRO agreement. Within one . . . hour of leaving the June 1, 2009 meeting, [Qureshi] prepared and faxed back to Ms. Perrin and [another Parsons agent] a 16-item matrix setting forth our services," which MetroplexCore submitted as evidence.

Jackson averred that when he met with Perrin, she assured him that his company was part of Parsons' Phase II team. After a conversation on March 5, 2009, Jackson followed up with Perrin via email, writing: "It was great talking to you this morning. I'm looking forward to getting this project kick[ed] off. It has been a long time coming." Jackson states that he "was personally present and sitting with Sallye and other Parsons representatives in front of the METRO

Board when they voted on the contract. [He] also assured them that MetroplexCore was part and parcel with the finally-negotiated Parsons Facility Provider contract" *i.e.*, Phase II. He stated that "Dixon, before casting his vote, asked [Jackson] to confirm that in fact the prior representations about MetroplexCore being a partner on the management team and participating in the long-term operations was in fact still in place. [Jackson] and Sallye Perrin confirmed again to him that this was the case." Jackson averred that Perrin made the following specific statements, among others, to him and MetroplexCore after the Washington contract was terminated:

> Willard, our commitment to you is still in play with METRO and we can still get the contract.

> Willard, if Parsons gets the Facility Provider contract after the Washington Group's contract is terminated, we are still committed to MetroplexCore being on the management team.

> Willard, please stay on our team because we can still get the METRO contract if the Washington Group does not finalize the contract with METRO.

> Let's keep our team together because we don't know what's going to happen with the Washington Group and the final contract.

> Willard, we are going to live up to our commitment to you.

According to Jackson, "[a]ll of the above statements were repeatedly made to [him] and MetroplexCore representatives by Sallye Perrin even after the Washington Group received an initial award from the METRO Board and up to the time that the Washington Group was terminated and Parsons selected[.]"

However, Jackson explained, Perrin did not follow through with those promises once Parsons obtained the METRO contract and the project was underway. Jackson recalled that, after the June 1, 2009, meeting concluded, Perrin approached him and stated: "Willard, I know we made commitments to

No. 12-20466

MetroplexCore. I need you to give me a break. I overcommitted to a lot of people to get the contract." Jackson responded that it "was her problem, that [he] had relied upon Parsons' commitments throughout the process, had expended tremendous personal, political and financial capital to win support for Parsons' contract and that [he] expected Parsons to live up to the deal they made with MetroplexCore." Jackson states that Parsons cut off communication with him and MetroplexCore from that date on. On December 23, 2009, MetroplexCore wrote to Parsons to inquire as to its share of the profits. Perrin denied that MetroplexCore was part of the Phase II process.

MetroplexCore filed suit against Parsons[2] in state court in Harris County, Texas, seeking a declaratory judgment and damages for breach of contract, promissory estoppel, and negligent or intentional misrepresentation.[3] Parsons removed the case to the United States District Court for the Southern District of Texas. Parsons filed a motion for summary judgment, which the district court granted on July 3, 2012. MetroplexCore filed its Notice of Appeal on July 7, 2012, and filed an amended Notice of Appeal on August 8, 2012.

## II.

The basis for the district court's jurisdiction was diversity of citizenship. *See* U.S. CONST. art. III, § 2, cl. 7; 28 U.S.C. § 1332. The amount in controversy exceeds $75,000; MetroplexCore, LLC is a Texas limited liability company; and Parsons Transportation Group, Inc. is corporation with offices located in Houston, Texas, and incorporated in Illinois. The record reflects that Parsons lists its main address as being in Washington, D.C., and it is undisputed that

---

[2] MetroplexCore also filed suit against Perrin and METRO, but Perrin was dismissed as a party and MetroplexCore abandoned its claims against METRO. Parsons is the only remaining defendant and is the only appellee in the present appeal, and MetroplexCore does not challenge the dismissal of Perrin on appeal.

[3] On appeal, MetroplexCore does not challenge the grant of summary judgment as to its negligent misrepresentation claim.

No. 12-20466

Parsons' principal place of business or "nerve center" is a state other than Texas. *Hertz Corp. v. Friend*, 559 U.S. 77, 93 (2010).[4]  This Court has jurisdiction to review the timely appealed final decisions of district courts.  28 U.S.C. § 1291. The district court entered final judgment on July 3, 2012.  MetroplexCore entered its original Notice of Appeal on July 5, 2012, which contained sufficient notice and was timely filed.  *See* FED. R. APP. P. 3(c)(1), 4(a)(1)(A).  Jurisdiction is therefore proper.

## III.

"We review the district court's grant of summary judgment de novo, affirming only if the moving party has demonstrated that there is no genuine issue as to any material fact and that judgment as a matter of law is warranted." *Total E & P USA Inc. v. Kerr-McGee Oil & Gas Corp.*, 719 F.3d 424, 434 (5th Cir. 2013) (citing *McMurray v. ProCollect, Inc.*, 687 F.3d 665, 669 (5th Cir. 2012); FED. R. CIV. P. 56(c)).  "In determining whether a case presents triable issues of fact, we, like the district court, may not make credibility determinations or weigh the evidence and we must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991)).

This action was removed from Texas state court to the District Court for the Southern District of Texas, and it is undisputed that Texas law applies.  *See Day & Zimmerman, Inc. v. Challoner*, 423 U.S. 3, 4-5 (1975) (per curiam);

---

[4] While "[t]he burden of persuasion for establishing diversity jurisdiction . . . [is] on the party asserting it," *Hertz Corp.*, 559 U.S. at 96, in resolving jurisdictional questions, undisputed facts and "'facts expressly or impliedly found by the district court are accepted on appeal unless the findings are clearly erroneous,'" *Pederson v. La. State Univ.*, 213 F.3d 858, 869 (5th Cir. 2000) (quoting *Complaint of Tom–Mac, Inc.*, 76 F.3d 678, 682 (5th Cir. 1996)). Because nothing in the record suggests that Parsons maintains its principal place of business in Texas, we accept the district court's implied finding to this effect and conclude that § 1332's requirement of complete diversity is met and subject-matter jurisdiction is proper.

No. 12-20466

*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938).

## IV.

## A.

First, MetroplexCore argues that the district court erred in concluding that there was no genuine issue as to the formation and existence of an enforceable joint venture agreement.[5]  In Texas, "[a] joint venture has four elements: (1) a community of interest in the venture, (2) an agreement to share profits, (3) an agreement to share losses, and (4) a mutual right of control or management of the enterprise.  Generally, a joint venture is governed by the rules applicable to partnerships." *Smith v. Deneve*, 285 S.W.3d 904, 913 (Tex. App. 2009) (citations omitted); *accord, e.g.*, *Ben Fitzgerald Realty Co. v. Muller*, 846 S.W.2d 110, 120 (Tex. App.—Tyler 1993, writ denied) ("The principal distinction between a joint venture and a partnership is that a joint venture is usually limited to one particular enterprise.  As a general rule, a joint venture is governed by the same rules as a partnership, and vice versa." (citations omitted)); *see also* TEX. BUS. ORG. CODE § 152.051(b) ("[A]n association of two or more persons to carry on a business for profit as owners creates a partnership,

---

[5] Parsons argues that MetroplexCore forfeited its joint venture claim by failing to plead it below.  We disagree.  Although MetroplexCore asserted a cause of action for breach of contract and did not mention in its complaint any allegation that it was part of a "partnership" or "joint venture," MetroplexCore alleged that Parsons invited MetroplexCore to "join as a part of [Parsons'] proposal" and that MetroplexCore would be part of the "team," and explicitly relied on a partnership and joint venture theory in its opposition to Parsons' motion for summary judgment. MetroplexCore also emphasized in other district court filings that it was not alleging that it had a subcontractor agreement with Parsons, but rather that it was a "principal in the management team handling the contract."  As such, Parsons was aware of MetroplexCore's joint venture theory of the case and therefore cannot claim prejudice or "unfair surprise," and the district court had an opportunity to rule on the joint venture theory. *E.g.*, *Allied Chem. Corp. v. Mackay*, 695 F.2d 854, 856 (5th Cir. 1983).  We therefore review MetroplexCore's joint venture argument under the usual standard.

regardless of whether: (1) the persons intend to create a partnership; or (2) the association is called a 'partnership,' 'joint venture,' or other name.").

Section 152.052(a) of the Texas Business Organizations Code sets out five factors for determining whether a partnership has been created:

> (1) receipt or right to receive a share of profits of the business; (2) expression of an intent to be partners in the business; (3) participation or right to participate in control of the business; (4) agreement to share or sharing: (A) losses of the business; or (B) liability for claims by third parties against the business; and (5) agreement to contribute or contributing money or property to the business.

That section further provides that "[a]n agreement by the owners of a business to share losses is not necessary to create a partnership." *Id.* § 152.052(c). Conversely, simply showing "the right to share or sharing gross returns or revenues" is insufficient "by itself" to show that "a person is a partner in the business." TEX. BUS. ORG. CODE § 152.052(b), (b)(3). "Shared rights to profits and to control the business are generally considered the most important factors in establishing the existence of a partnership." *Westside Wrecker Serv., Inc. v. Skafi*, 361 S.W.3d 153, 166 (Tex. App.—Houston [1st Dist.] 2011, pet. denied).

"First, Texas defines a 'community of interest' as 'a commonly shared incentive between the parties as to the progress and goals of the joint venturers.'" *Ballard v. United States*, 17 F.3d 116, 118 (5th Cir. 1994) (quoting *Hasslocher v. Heger*, 670 S.W.2d 689, 693 (Tex. App.—San Antonio 1984, writ refused n.r.e.) (in turn citing *W.H. Hodges & Co. of Alexandria, Inc. v. Donley Cnty. State Bank*, 407 S.W.2d 221, 224 (Tex. 1966))). MetroplexCore produced evidence of a community of interest in the venture at least in Phase I, and arguably in Phase II, because the parties had a mutual interest and "commonly shared incentive" in obtaining the METRO contract. *Id.* This factor is met. *Cf., e.g., S. Sur. Co. v. Tex. Emp'rs' Ins. Ass'n*, 2 S.W.2d 310, 312 (Tex. Civ. App.—Waco 1927, writ ref'd) (holding there existed a genuine issue of material

fact as to whether a construction venture was intended as a partnership or whether it was intended as a general contractor-subcontractor relationship); *Westside Wrecker*, 361 S.W.3d at 166 (assessing whether construction project participants formed a community of interest); *Ben Fitzgerald Realty*, 846 S.W.2d at 122 (same). However, this factor alone is not sufficient to create a partnership or joint venture; more indicia are required. *See* TEX. BUS. ORG. CODE § 152.052(b), (b)(3).

As regards profit-sharing, MetroplexCore argues that there was an agreement to share the profits in respective 90% and 10% shares, citing Perrin's 2007 letter that MetroplexCore "will participate in the contract to a minimum 10% level." Jackson attested that "Sallye Perrin assured [him] verbally that if MetroplexCore accepted Parsons' commitments, [MetroplexCore] would . . . receive not less than ten percent . . . of the value of any METRO Facility Provider contract awarded to Parsons . . . [and] ten percent . . . of the value from the operations of the rail system by and through Parsons' partner, Veolia." However, the promise made on Parsons' own behalf (as opposed to on behalf of Veolia) only relates to Phase I of the project, and the written evidence does not unequivocally establish that MetroplexCore was entitled to 10% of the *profits* instead of 10% of, for instance, the workload or management responsibility. Moreover, Parsons produced evidence that it had profit-sharing joint venture agreements with its other collaborators, and there is not evidence that MetroplexCore had a similar contract. Even taken in a light most favorable to MetroplexCore, it is difficult to say that a reasonable trier of fact could find that there was an agreement to share 10% of the profits. But even if there were a genuine issue of material fact as to the profit-sharing element, Texas law specifically provides that "the right to share . . . gross returns or revenues, regardless of whether the persons sharing the gross returns or revenues have a common or joint interest in the property from which the returns or revenues are

derived," "by itself, does not indicate that a person is a partner in the business." TEX. BUS. ORG. CODE § 152.052(b), (b)(3). More evidence of a partnership or joint venture is required.

MetroplexCore has not met either of the two remaining common-law elements of a joint venture. MetroplexCore did not attempt to argue that it had an agreement to share losses with Parsons, *see Smith*, 285 S.W.3d at 913, although, as noted above, this factor is not necessary to establish a partnership, *see* TEX. BUS. ORG. CODE § 152.052(c). Importantly, MetroplexCore also did not allege or argue that it, along with Parsons, had a "mutual right of control or management of the enterprise." *Smith*, 285 S.W.3d at 913; *see* TEX. BUS. ORG. CODE § 152.052(a)(3). It pointed to evidence that it had a "management role" in the operation, but the evidence shows that for Phase I, MetroplexCore would manage certain aspects of the project; the record does not contain evidence that MetroplexCore would have a coequal or "mutual" right to control and manage the enterprise. *E.g.*, *Smith*, 285 S.W.3d at 913. Furthermore, MetroplexCore has not argued or presented any evidence of the other factors listed in section 152.052(a) for determining whether a partnership has been created, *viz.*, that it would share in "liability for claims by third parties against the business" or that it had "agreed to contribute or contributing money or property to the business." TEX. BUS. ORG. CODE §§ 152.052(a)(4)(B), (a)(5).

Finally, even if the evidence could support a finding of the existence of a joint venture agreement with respect to Phase I of the project, the evidence does not create a genuine issue of fact with respect to Phase II of the project. MetroplexCore relies on assertions in its witnesses' affidavits that the original bid never dissolved and that the Phase II bid was "based on" the original bid and that, even though the technical specifications had changed, it was not "totally different" from that "contemplated" in the original bidding process. However, the Parsons contract very well could have been *based on* the original bid, even

though the original bid—and therefore the MetroplexCore-Parsons agreement—had technically expired. The question is whether the MetroplexCore-Parsons agreement had expired or dissolved before the Phase II negotiations began. The only evidence in the record on this point is the parties' bid extension agreement, which states that "the offer represented by [the Parsons team] Proposal . . . will remain valid until May 27, 2007," indicating that the agreement dissolved on or after that date—well before Washington Group's contract terminated on April 29, 2008. In rebuttal, MetroplexCore cites the rules in METRO's Request for Qualifications, which provided that, for "Phase I," METRO would "have the right to terminate unsuccessful discussions" with the first-ranked bidder "and to proceed with discussions with the next highest ranked Offeror." However, there was no similar language under the header "Phase II" of the Request; and in any event METRO's rules did not purport to bind METRO or the original bidders to keep their "teams" together for the duration of the project, which was slated to last for years. The only evidence on point is Parsons' extension agreement providing that the bid would expire on May 27, 2007. Thus, the record is devoid of evidence that would support the existence of an enforceable joint venture agreement with respect to Phase II of the project.

The evidence does not demonstrate a genuine issue as to whether MetroplexCore and Parsons had a joint venture agreement, or that, if there was one, that it remained effective into the parties' Phase II negotiations. Because MetroplexCore's joint venture claim is premised entirely on its role in Phase II of the contract, Parsons is entitled to summary judgment on that claim.[6]

---

[6] Because we conclude that there is no genuine issue of material fact regarding the alleged joint venture agreement with consideration of both the written and parol evidence in the record, we need not consider the parties' alternative contentions regarding the applicability of the Statute of Frauds. *See* TEX. BUS. & COMM. CODE § 26.01(a).

No. 12-20466

## B.

MetroplexCore alternatively contends that it is entitled to recover in quantum meruit. "Quantum meruit is an equitable theory of recovery which is based on an implied agreement to pay for benefits received." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992) (citing *Vortt Exploration Co., Inc. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990)). "Quantum meruit is an equitable remedy which does not arise out of a contract, but is independent of it. Generally, a party may recover under quantum meruit only when there is no express contract covering the services or materials furnished. This remedy 'is based upon the promise implied by law to pay for beneficial services rendered and knowingly accepted.' Recovery in quantum meruit will be had when non payment for the services rendered would 'result in an unjust enrichment to the party benefited by the work.'" *Vortt*, 787 S.W.2d at 944 (citations omitted). To recover in quantum meruit, a plaintiff must establish that: "1) valuable services and/or materials were furnished, 2) to the party sought to be charged, 3) which were accepted by the party sought to be charged, and 4) under such circumstances as reasonably notified the recipient that the plaintiff, in performing, expected to be paid by the recipient." *Id.*

The Texas Supreme Court has held that a partner in a joint undertaking or venture generally cannot recover in quantum meruit against another partner because a joint venturer does not "render[ ] services for [another joint venturer] . . . . Instead, pursuant to the joint venture agreement, he perform[s] [ ] services for the joint venture. To recover in quantum meruit, the plaintiff must show that his efforts were undertaken for the person sought to be charged; it is not enough to merely show that his efforts benefitted the defendant." *Truly v. Austin*, 744 S.W.2d 934, 937 (Tex. 1988) (citation omitted). In *Truly*, the plaintiff partner "rendered services for the joint venture in an effort to enhance the success and profitability of a project in which he held a 40% ownership interest[,]

14

. . . thus act[ing] to benefit his own financial interests as well as those of his co-joint venturers"; therefore, he could not recover in quantum meruit. *Id.*

By contrast, when the plaintiff has provided a service or benefit to the defendant for which the plaintiff would reasonably expect to be reimbursed, as opposed to acting for the participants' joint benefit, the plaintiff may be entitled to relief on a theory of quantum meruit. *See, e.g.*, *Vortt*, 787 S.W.2d 942. In *Vortt*, both the plaintiff, Vortt Exploration, and the defendant, Chevron, had mineral-rights contracts on different portions of a tract of land, and they entered into negotiations with an eye toward entering into a joint operating agreement. *Id.* at 943. The negotiations were ultimately unsuccessful, but in the course of the negotiations, Vortt furnished Chevron with "confidential" seismic services, graphics, and maps that Vortt had ordered and paid for. *Id.* at 945. Chevron ultimately declined to enter into a joint operating agreement with Vortt, but then utilized the maps and seismic information Vortt had provided to build a producing well. *Id.* Vortt sued for quantum meruit, and the Texas Supreme Court affirmed an award in its favor because the evidence supported a finding that "Chevron knew that Vortt furnished the information with the expectation that a joint operating agreement would be reached" and that Vortt expected to be paid for the services rendered. *Id.*

Under the foregoing authorities, MetroplexCore has not made out a case for quantum merit. First, for the reasons stated above, the record does not support a finding that Parsons and MetroplexCore had a formal joint venture agreement for Phase II of the project; however, the record does suport that they shared a "community of interest," meaning "'a commonly shared incentive between the parties as to the progress and goals of the joint venturers.'" *Ballard*, 17 F.3d at 118 (quoting *Hasslocher*, 670 S.W.2d at 693). We conclude that the reasoning of *Truly* is applicable to the case at bar because MetroplexCore "act[ed] to benefit [its] own financial interests as well as those of" Parsons.

*Truly*, 744 S.W.2d at 937. The valuable services that MetroplexCore alleges that it performed were "expend[ing] valuable time and effort meeting with Metro's board members and local congressmen and community leaders presenting and endorsing the HTS[ ] [Team] proposal" to help Parsons successfully obtain the second-ranked status for Phase I and, ultimately, the Phase II bid, "all in the expectation that Parsons would honor its promise to involve MetroplexCore as a 10% joint venturer in [the team's] work on the Project." But that type of activity—lobbying to improve a bid's chances of success—is precisely what the Texas Supreme Court in *Truly* would likely consider to be "services for the joint venture in an effort to enhance the success" of the community of interest. 744 S.W.2d at 937. Therefore, there is no unjust enrichment to Parsons for MetroplexCore's activities.

*Vortt* is unavailing to MetroplexCore in the face of *Truly*, as well as distinguishable on its facts. Here, unlike in *Vortt*, there is no evidence or other indication that MetroplexCore reasonably expected to be reimbursed for its lobbying activities. For one thing, the summary judgment evidence shows that MetroplexCore's intended role was to work on the team's environmental and hazardous material issues and to assume a management role in certain capacities; it does not show that MetroplexCore expected or hoped to join the team to perform professional lobbying services. Even if MetroplexCore was included in the bid because of its professional network or good reputation among METRO board members, this quality is not a "service" of a type for which a team member is usually compensated. This is a basic difference between this case and *Vortt*, where the plaintiff performed tangible work—producing seismic maps and similar documents—of a type for which a company would normally expect to be compensated.

Moreover, the parties' relationship is different from that in *Vortt*. Unlike in *Vortt*, where the parties never ultimately formed a joint operations

16

agreement, here, MetroplexCore and Parsons did have a formal agreement that governed the parties' relationship leading up to the original bid. It was during this period that MetroplexCore engaged in its lobbying activities to benefit the both of them—*i.e.*, to help the team secure the METRO bid—even though the effort was initially unsuccessful. This is more akin to the situation described in *Truly*, where the plaintiff was acting to benefit both partners, as opposed to only conferring a benefit upon the defendant. Under the circumstances, the lobbying activities were not something for which MetroplexCore could have reasonably been expected to be reimbursed because MetroplexCore and Parsons were in the same "community of interest" in that venture, *Smith*, 285 S.W.3d at 913, even if, as discussed above, there may have been only a contingent contracting agreement rather than a joint venture as such.

Finally, the record does not contain evidence that MetroplexCore engaged in lobbying activities during Parsons' discussions with METRO for the Phase II contract. The lobbying activities discussed in the summary judgment evidence were conducted to improve the HTS Team's chances of success leading up to the *original* bid. Thus, the evidence demonstrates only that MetroplexCore conducted lobbying activities at the time when its relationship with Parsons was governed by a contingent contracting agreement and the parties were engaged in a community of interest. There is no similar evidence to show that MetroplexCore continued these activities during or leading up to the Phase II negotiations when, as discussed above, there was no such agreement.

In sum, there is no genuine issue of material fact as to whether MetroplexCore furnished valuable services for the benefit of Parsons alone, rather than the community of interest that included MetroplexCore; nor as to whether services were rendered "under such circumstances as reasonably notified the recipient that the plaintiff, in performing, expected to be paid by the

recipient."  *Vortt*, 787 S.W.2d at 944 (citations omitted).  Accordingly, MetroplexCore cannot recover in quantum meruit as a matter of law.

## C.

Finally, MetroplexCore asserts that it is entitled to recover from Parsons under a theory of promissory estoppel.  Under Texas law, "[t]he requisites of promissory estoppel are: (1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment." *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983); *see also, e.g.*, *Fretz Constr. Co. v. So. Nat'l Bank of Hous.*, 626 S.W.2d 478, 483 (Tex. 1981).  "The function of the doctrine of promissory estoppel is . . . defensive in that it estops a promisor from denying the enforceability of the promise." *Wheeler v. White*, 398 S.W.2d 93, 96 (Tex. 1965).  In sum, "[w]here a promisee acts to his detriment in reasonable reliance upon an otherwise unenforceable promise, . . . the disappointed party may have a substantial and compelling claim for relief. . . . 'A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.'" *Id.* (quoting RESTATEMENT OF CONTRACTS § 90)*; see also, e.g.*, *Fretz*, 626 S.W.2d at 480 (quoting and applying Restatement test for promissory estoppel).  The burden of proving all the essential elements of promissory estoppel is on the party asserting the doctrine. *Concord Oil Co. v. Alco Oil & Gas Corp.*, 387 S.W.2d 635, 639 (Tex. 1965).  "In a claim for promissory estoppel, only reliance damages are allowed." *Cent. Tex. Micrographics v. Leal*, 908 S.W.2d 292, 298 (Tex. App.—San Antonio 1995, no writ) (citing *Fretz*, 626 S.W.2d at 483).[7]  Reliance damages seek to put the

---

[7] In Texas, claims of promissory estoppel and detrimental reliance based in contract are the same cause of action.  *E.g.*, *Univ. of Tex. Sys. v. Courtney*, 946 S.W.2d 464, 468 (Tex. App.—Fort Worth 1997, writ denied); *Garner v. Corpus Christi Nat'l Bank*, 944 S.W.2d 469,

injured party in the position that he or she would have been in had he not relied on the promise. *See Fretz*, 626 S.W.2d at 478. Such damages "includ[e] expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed." *Hart v. Moore*, 952 S.W.2d 90, 97 (Tex. App.—Amarillo 1997, pet. denied).

In *Fretz Construction Co. v. Southern National Bank of Houston*, the plaintiff, Fretz, was a general contractor who agreed to perform construction work on an office building in Houston. 626 S.W.2d at 479. Fretz had previously entered into a construction contract with the builder, Aqua-Con of South Texas, Inc., but that contract was cancelled due to Aqua-Con's inadequate funding. *Id.* Aqua-Con then obtained funding from the Southern National Bank of Houston, which assured Fretz that he would be reimbursed for his contracting services and expenses if he agreed to go forward with the project. *Id.* at 479-80. Fretz signed a new contract with Aqua-Con that had similar specifications as the prior cancelled contract. *Id.* After completing work on the project, however, Aqua-Con defaulted on its obligation to pay Fretz his agreed fee, and Fretz filed suit against the bank for, *inter alia*, promissory estoppel arising from the bank's "assurances" to Fretz. *Id.* at 479-80, 481.

The Texas Supreme Court affirmed the jury's verdict in favor of Fretz, holding that all of the elements of promissory estoppel were met. *Id.* at 479. The court held that the bank's "assurances" to the plaintiff that Fretz would be paid his share of the project's proceeds was sufficiently concrete because it amounted to a promise above and beyond what the defendant was already obligated to do by virtue of its financing agreement with Aqua-Con, *id.* at 479-81; Fretz relied by waiting to sign the contract and to deliver the performance bonds to Aqua-

480 (Tex. App.—Corpus Christi 1997, writ denied), *modification on other grounds recognized by Ash v. Hack Branch Distrib. Co.*, 54 S.W.3d 401, 414 (Tex. App.—Waco 2001, pet. denied).

No. 12-20466

Con until he received the bank's reassurances, *id.* at 483; it was reasonable for the bank to expect that Fretz would rely because the bank had been informed that Fretz needed its reassurance before he would proceed, *id.*; and Fretz suffered foreseeable, cognizable damages because he had expended funds in preparation for the project, *id.* at 483-84, in particular because "the work performed pursuant to the oral agreements was work which was called for under the original contract," *id.* at 484. Accordingly, the court held that the jury was justified in awarding Fretz damages on his theory of promissory estoppel. *Id.*

### 1.

First, there is a genuine issue as to whether Perrin made promises that she could have reasonably foreseen would induce reliance. As an initial matter, the district court rejected MetroplexCore's promissory estoppel claim in part because it concluded Perrin's statements were hearsay. However, Perrin was an "agent or employee" of Parsons, a party to this action, and the parties do not dispute that Perrin was acting within the scope of her duties as Vice-President when she made the alleged statements. FED. R. EVID. 801(d)(2)(D). The statements would therefore be admissible as nonhearsay. *See id.*; *Moss v. Ole S. Real Estate, Inc.*, 933 F.2d 1300, 1312 (5th Cir. 1991) ("If parties to the lawsuit or agents of the parties made the statements [in question], the statements are not within the definition of hearsay and are admissible against the parties."). We may properly consider Perrin's alleged statements in assessing whether the summary judgment evidence creates a genuine issue of material fact.

The summary judgment record is replete with references to the specific "reassurances" that Perrin made to MetroplexCore during and leading up to the Phase II negotiations. Willard Jackson stated that he "was personally present and sitting with Sallye and other Parsons representatives in front of the METRO Board when they voted on the contract. . . . [and that he] and Sallye Perrin

confirmed again to [Dixon] that this was the case." Jackson further averred that Perrin made the following specific statements, among others, to him and MetroplexCore after the Washington contract was terminated: "[O]ur commitment to you is still in play with METRO and we can still get the contract"; "[I]f Parsons gets the Facility Provider contract after the Washington Group's contract is terminated, we are still committed to MetroplexCore being on the management team"; "[P]lease stay on our team because we can still get the METRO contract if the Washington Group does not finalize the contract with METRO"; "Let's keep our team together because we don't know what's going to happen with the Washington Group and the final contract"; and "[W]e are going to live up to our commitment to you." Perrin, in allegedly making those statements to MetroplexCore's officers on her company's behalf, promised to include MetroplexCore in the project if her company was awarded the contract. As in *Fretz*, those promises went above and beyond any duty that Perrin owed MetroplexCore because she was no longer under any contractual duty to include MetroplexCore in her company's project since their joint bidding agreement had expired. *See Fretz*, 626 S.W.2d at 479.

Moreover, given the parties' prior relationship during the original bidding process, and the specific nature of Perrin's alleged repeated reassurances, a reasonable trier of fact could conclude that Perrin could have reasonably expected her promises to induce substantial reliance on the part of MetroplexCore. A fact-finder could reasonably conclude that Perrin was promising to abide by the same terms to which MetroplexCore and Parsons had agreed during their first round of bidding. *See id.* at 484 (concluding the bank's promise was sufficiently concrete to reasonably and foreseeably induce reliance, and observing, in support, that "the work performed pursuant to the oral agreements was work which was called for under the original contract"). Furthermore, the summary judgment record could support a finding that Perrin

was on notice that MetroplexCore would rely on her promises. Jackson averred that, after his June 1, 2009 meeting with Perrin when she asked him to give her a "break" because she "overcommitted" on the contract, Jackson immediately responded that it "was her problem, that [he] had relied upon Parsons' commitments throughout the process, had expended tremendous personal, political and financial capital to win support for Parsons' contract and that [he] expected Parsons to live up to the deal they made with MetroplexCore." *See id.* at 483 (concluding the plaintiff's reliance was reasonable because the bank had notice that Fretz needed its reassurance before he would proceed with the project). In sum, a fact-finder could conclude that MetroplexCore's reliance was foreseeable.

Next, there is a genuine issue as to whether MetroplexCore "reasonably and substantially" relied on Perrin's promises. In *Fretz*, the Texas Supreme Court held that the jury was justified in finding that the plaintiff suffered foreseeable, cognizable damages because he had expended funds in preparation for the project and that the work he had performed in reliance on the bank's promise was work that was related to the work that he had been called upon to perform under the parties' original written contract, which had expired. *Id.* at 483-84. In particular, the court noted, the plaintiff had not delivered a contract to its client until after he received assurances from the bank that he would be paid, and he did not deliver payment or performance until after it received those assurances. *Id.* The Texas Supreme Court held that the timing of these actions and the actions themselves constituted "some evidence of reasonable reliance by Fretz." *Id.*

Here, as in *Fretz*, there is evidence in the record that would allow a jury to find that MetroplexCore actually relied on Perrin's promises to it and its officers. As MetroplexCore's summary judgment evidence reflected, in reliance upon Parsons' agreement to enter into a joint venture with MetroplexCore to

pursue the Project, MetroplexCore severed ties with Team Express, Inc., the Washington Group's project, at Parsons' behest, forfeiting a subcontract it estimates to be worth $2 million; passed up on other business opportunities; and retained extra personnel for several years in anticipation of working on the Project at great expense. Specifically, Zia Qureshi, President and former Chief Operating Officer of MetroplexCore, attested:

> Because of the promise and commitment by Parsons/Perrin to MetroplexCore, we decided to retain extra staff that would have been laid off in anticipation of handling the Parsons work. Also, because we were handling other business as well, we began to plan for staffing needs to handle the increased Parsons work. Average cost per support employee retained was approximately $60,000-$80,000 and six-figure amounts for other technical professionals. I have clear recollection of our retention of employees that likely would have been otherwise laid off [who] were retained in anticipation of the Parsons[ ] work. In this regard, not only did we retain employees that may otherwise have been let go (approximately 4-6), we also understood that we had to keep open capacity to handle this business at a moment's notice. As such, we held off on and/or could not accept additional work that would conflict with our capacity to handle the Parsons/METRO business.

Jackson attested to similar figures:

> MetroplexCore . . . retained approximately 10-15 workers on staff in our engineering department during the time between April 2007 and March 2009 in anticipation of handling the Parsons work. Retaining these workers was undertaken in order to have enough people on hand to handle the Parsons/METRO work. This retention of workers resulted in a loss to us of between $1-$3 million dollars in extra costs to our business. Also, by giving up our interests in Team Express, we forfeited an additional $2 million in profits in reliance upon the commitments made by Parsons and Sallye Perrin.

MetroplexCore alleges it would not have undertaken any of these actions but for Perrin's repeated assurances that MetroplexCore would be a part of the Phase II "team." Based on the foregoing summary judgment evidence, we conclude that a jury could reasonably find that MetroplexCore actually and substantially relied on Perrin's promises.

No. 12-20466

The district court concluded that MetroplexCore did not actually rely on Perrin's promises when it opted to keep on extra staff or to divest itself of its interest in Team Express in 2009, and that it did not actually lose other opportunities by waiting for marching orders from Parson. A trier of fact might very well conclude that from the evidence, but a trier of fact could also conclude that MetroplexCore did actually rely; at the summary judgment phase, the district court impermissibly resolved disputed questions of fact in favor of the moving party, Parsons. We conclude that there is enough evidence in the record to create a genuine issue as to whether MetroplexCore substantially relied to its detriment on Perrin's promises and reassurances.

There is also enough evidence to create a genuine issue as to whether the reliance was reasonable. MetroplexCore presented evidence that its members genuinely believed and relied upon Perrin's statements and promises. Allegedly on Perrin's request, Qureshi prepared a detailed list of services in which MetroplexCore had "high competence" as requested by Perrin. Similarly, after a conversation with Perrin on March 5, 2009, Jackson followed up via email, writing: "It was great talking to you this morning. I'm looking forward to getting this project kick[ed] off. It has been a long time coming." Likewise, Jackson states that, after "the Washington Group failed to approve a final contract with METRO and was terminated," he "was personally present and sitting with Sallye and other Parsons representatives in front of the METRO Board when they voted on the contract. [He] also assured them that MetroplexCore was part and parcel with the finally-negotiated Parsons Facility Provider contract [i.e., Phase II]. . . . Dixon, before casting his vote, asked [Jackson] to confirm that in fact the prior representations about MetroplexCore being a partner on the management team and participating in the long-term operations was in fact still in place. [Jackson] and Sallye Perrin confirmed again to him that this was the case. . . . This confirmation of the

24

No. 12-20466

Parsons/MetroplexCore commitment was made within hours of the Board voting to approve the contract with Parsons."

On the other hand, Jackson avers that after the June 1, 2009, meeting concluded, Perrin approached Jackson and stated: "Willard, I know we made commitments to MetroplexCore. I need you to give me a break. I overcommitted to a lot of people to get the contract," and that Parsons subsequently cut off communication with him and MetroplexCore. Meanwhile, Perrin avers that she never made any such promises.

Given the public and repeated nature of Perrin's alleged statements, and given the plainly conflicting accounts of what transpired, the question of MetroplexCore's reliance must be resolved by a trier of fact.

**2.**

Finally, Parsons argues that MetroplexCore's promissory estoppel claim is barred by the Statute of Frauds, citing *Ford v. City State Bank of Palacios*, 44 S.W.3d 121, 139 (Tex. App.—Corpus Christi 2001, no pet.) ("When promissory estoppel is raised to bar the application of the statute of frauds, there is an additional requirement that the promisor promised to sign a written document complying with the statute of frauds."). However, MetroplexCore is asserting promissory estoppel as a separate cause of action, not as a defense to the Statute of Frauds. *See, e.g.*, *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 693 (Tex. 2002) (listing promissory estoppel as separate "cause of action"); *Fretz*, 626 S.W.2d at 479, 484 (same); *Wheeler*, 398 S.W.2d at 96 (setting out elements of a "claim for relief" under a theory of promissory estoppel). In its promissory estoppel claim, brought in the alternative to its joint venture claim, MetroplexCore is not seeking to enforce an alleged oral contract to participate in the Phase II project in this claim, but rather to recapture the damages it incurred in reliance on Perrin's promises. *Cf., e.g.*, *Ford*, 44 S.W.3d at 139; *Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 438 (Tex. App.—Dallas 2002, pet.

25

denied) ("To invoke the application of promissory estoppel *where there is an oral promise to sign an agreement*, . . . the agreement that is the subject of the promise must comply with the statute of frauds.  That is, the agreement must be in writing at the time of the oral promise to sign it.") (citation omitted) (emphasis added); *Sullivan v. Leor Energy LLC*, No. H-05-3913, 2006 WL 2792909, at *5 (S.D. Tex. Sept. 27, 2006) (unpublished) (differentiating between promissory estoppel as a cause of action and as a defense to the application of the Statute of Frauds and explaining that the latter has a different set of elements, namely, "(1) that the parties' oral agreement had been reduced to writing; (2) that the Defendants promised to sign that existing written agreement; and (3) that [the plaintiff] relied on the Defendants' promise to sign the agreement to his detriment"), *aff'd*, 600 F.3d 542 (5th Cir. 2010).  The Statute of Frauds is no bar to MetroplexCore's claim for reliance damages under its theory of promissory estoppel.

We therefore conclude that the district court erred in granting summary judgment to Parsons on MetroplexCore's promissory estoppel claim.

## CONCLUSION

For the foregoing reasons, we AFFIRM the order granting summary judgment as to MetroplexCore's claims of breach of a joint venture agreement, fraudulent misrepresentation, and quantum meruit  claims, but we REVERSE the order as to MetroplexCore's promissory estoppel claim and REMAND for further proceedings.